273 F.3d 120 (2nd Cir. 2001)
 SAJIDA BANO, HASEENA BI, SUNIL KUMAR, DR. STANLEY NORTON, ASAD KHAN, SHIV NARAYAN MAITHIL, DEVENDRA KUMAR YADAV, BHOPAL GAS PEEDIT MAHILA UDYOG SANGATHAN, (BGPMUS), GAS PEEDIT NIRASHRIT PENSION BHOGI SANGHARSH MORCHA,(GPNPBSM), BHOPAL GAS PEEDIT STATIONERY KARMACHARI SANGH,(BGPMSKS), BHOPAL GAS PEEDIT SANGHARSH SAHAYOG SAMITI,(BGPSSS), BHOPAL GROUP FOR INFORMATION AND ACTION (BGIA), On behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v
UNION CARBIDE CORPORATION and WARREN ANDERSON Defendants-Appellees.
 Docket No. 00-9250
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: April 16, 2001
Decided: November 15, 2001
Errata Filed: December 13, 2001
 
 Appeal from an order of the United States District Court for the Southern District of New York (John F. Keenan, Judge) granting motions by the defendants for summary judgment or to dismiss the plaintiffs' complaint for failure to state a claim upon which relief can be granted. We hold that the district court properly dismissed the plaintiffs' claims under the Alien Tort Claims Act, 28 U.S.C. 1350, but erred in dismissing the plaintiffs' common-law environmental claims.
 Affirmed in part, vacated in part, and remanded.
 KENNETH F. McCALLION, Goodkind Labaton Rudoff & Sucharow, LLP (H. Rajan Sharma, of counsel), New York, New York; Law Offices of Curtis Trinko, LLP, New York, New York; Richard L. Herz, Earthrights International, Washington, D.C., for Plaintiffs-Appellants.
 WILLIAM A. KROHLEY, Kelley Drye & Warren, LLP (William C. Heck, of counsel), for Defendants-Appellees.
 James Silk, New Haven, CT, submitted a brief for Amici Curiae Allard K. Lowenstein International Human Rights Law Clinic, The Center for Constitutional Rights, and the Center for International Environmental Law.
 Before: LEVAL, POOLER, and SACK, Circuit Judges.
 SACK, Circuit Judge:
 
 
 1
 This litigation is the latest of many legal battles stemming from perhaps history's worst industrial catastrophe: the 1984 toxic gas disaster at a chemical plant in Bhopal, India. Earlier actions included scores of individual and class-action complaints filed in federal courts throughout the United States and consolidated in the United States District Court for the Southern District of New York. Those claims were dismissed in deference to the Indian government's efforts on behalf of disaster victims to pursue a global resolution in India of claims related to the disaster. The ensuing litigation in India eventually produced a settlement agreement, which gained the final approval of the Supreme Court of India in 1991.
 
 
 2
 The present action is in part an effort to obtain further redress for the Bhopal disaster in United States courts. The plaintiffs assert that they are victims of the disaster, their next-of-kin, and groups representing victims. The defendants are Union Carbide Corporation ("Union Carbide") and its former Chief Executive Officer, Warren Anderson. At the time of the disaster, Union Carbide was the majority owner of Union Carbide India Limited ("UCIL"), which owned and operated the Bhopal plant. The plaintiffs allege that the defendants' conduct leading up to the disaster violated various norms of international law, and seek relief under the Alien Tort Claims Act, 28 U.S.C. 1350 (the "ATCA").[1]
 
 
 3
 We hold that the fugitive disentitlement doctrine, which the plaintiffs argue bars the defendants from asserting defenses or dispositive motions based upon Indian law, is inapplicable to this case. And we hold that these claims are barred by the Indian settlement, which encompasses all civil claims related to the disaster.
 
 
 4
 The plaintiffs also raise several common-law claims seeking relief for environmental contamination at the Bhopal plant allegedly unrelated to the 1984 gas leak. The district court dismissed the plaintiffs' entire complaint without directly addressing these claims. We vacate and remand the district court's order insofar as it granted summary judgment to the defendants on the additional environmental claims in order to permit the court to address them in the first instance.
 
 BACKGROUND
 
 5
 On the night of December 2-3, 1984, the UCIL Bhopal chemical plant leaked a large quantity of methyl isocyanate, a highly toxic gas, into the City of Bhopal, State of Madhya Pradesh, Union of India. Winds blew the gas into densely populated neighborhoods, resulting in thousands of deaths and more than two hundred thousand injuries. See In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India, 634 F. Supp. 842, 844 (S.D.N.Y. 1986) ("Bhopal I").
 
 
 6
 Shortly after the disaster, victims and their relatives began to seek recovery from Union Carbide in United States courts. On February 6, 1985, the Judicial Panel on Multidistrict Litigation assigned 145 purported class actions that had been filed in federal courts throughout the country to the Southern District of New York. See id. A consolidated complaint was filed in that court on June 28, 1985.
 
 
 7
 On March 29, 1985, India adopted the Bhopal Gas Leak Disaster (Processing of Claims) Act (the "Bhopal Act"). That statute purported to give the Indian government the exclusive authority to represent victims of the Bhopal disaster in courts around the world. Individual victims and groups of victims, including several of the plaintiffs in this case, later challenged the validity of the Bhopal Act under the Indian Constitution. The Supreme Court of India upheld the Act. See Sahu v. Union of India, A.I.R. 1990 S.C. 1480 ("Sahu").
 
 
 8
 On April 8, 1985, meanwhile, the Indian government, acting pursuant to its authority under the Bhopal Act, filed a complaint in the United States District Court for the Southern District of New York on behalf of all victims of the disaster. In May 1986, the district court (John F. Keenan, Judge) dismissed the consolidated action, but made the dismissal contingent upon, among other things, Union Carbide's submission to the jurisdiction of Indian courts. See Bhopal I, 634 F. Supp. at 867. We affirmed in In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India, 809 F.2d 195 (2d Cir.), cert. denied, 484 U.S. 871 (1987).
 
 
 9
 In September 1986, the Indian government filed suit against Union Carbide in Bhopal District Court. Independently of that action, in November 1987, India's Central Bureau of Investigation filed criminal charges against, among others, UCIL, Union Carbide, and Warren Anderson, alleging culpable homicide, grievous hurt, and causing death by use of a dangerous instrumentality.
 
 
 10
 Litigation in the civil suit proceeded for more than two years, during the course of which jurisdiction passed to the Supreme Court of India. Acting pursuant to Article 142(1) of the Indian Constitution, which enables the Supreme Court to fashion settlements in some circumstances,[2] the Court issued two orders, one dated February 14, 1989, the other dated the following day (together, the "1989 settlement orders"), which, among other things, memorialized the terms of a settlement agreement among the parties. See Union Carbide Corp. v. Union of India, A.I.R. 1990 S.C. 273, 274-76 ("Union of India I"). The February 14, 1989 settlement order required Union Carbide to pay $470 million to the Indian government "in full settlement of all claims, rights and liabilities related to and arising out of the Bhopal Gas disaster," and stated that "all civil proceedings" related to the disaster "shall stand concluded in terms of the settlement." Id. at 275. The February 15, 1989 settlement order reduced Union Carbide's share of the liability by $45 million to $425 million and required UCIL, instead, to pay that $45 million. See id.
 
 
 11
 The 1989 settlement orders also quashed all related criminal proceedings. Id. Among the contested issues on appeal is whether this aspect of the orders constituted a term of the preliminary settlement or was an independent ruling by the Supreme Court of India.
 
 
 12
 The Supreme Court of India later rejected a challenge to the validity of the 1989 settlement orders. See Union Carbide Corp. v. Union of India, A.I.R. 1992 S.C. 248 ("Union of India II"). The Court affirmed its jurisdiction under the Indian Constitution to fashion the relief contained in those orders and concluded that the settlement was just and reasonable. The Court modified the orders in one important respect, however. It overruled the portion of the order quashing additional criminal proceedings and ordered the criminal prosecution of Union Carbide, Anderson, and others to proceed. Id. at 312.
 
 
 13
 The criminal prosecution thereafter went forward in Bhopal District Court. Neither Anderson nor Union Carbide appeared for arraignment or any other proceedings in connection with that prosecution. In 1992, the Bhopal District Court declared them "absconders" and ordered the attachment of Union Carbide's remaining assets in India.
 
 
 14
 On the civil front, meanwhile, in 1990 two purported classes of plaintiffs filed new complaints related to the Bhopal disaster in Texas state courts. The complaints, among other things, challenged the validity of the 1989 settlement orders. Union Carbide removed the actions to two federal district courts in Texas, and the Judicial Panel on Multidistrict Litigation then transferred the cases to the Southern District of New York, where they too were assigned to Judge Keenan. That court dismissed the complaints, as it had the government of India's, on forum non conveniens grounds. See In re Union Carbide Corp. Gas Plant Disaster, No. MDL 626, 1992 WL 36135, 1992 U.S. Dist. LEXIS 1909 (S.D.N.Y. Feb. 18, 1992).
 
 
 15
 We affirmed, although on different grounds. See Bi v. Union Carbide Chems. and Plastics Co., 984 F.2d 582 (2d Cir.), cert. denied, 510 U.S. 862 (1993). We held that the plaintiffs lacked standing in light of the Bhopal Act's delegation to the Indian government of the exclusive right to represent the victims. Id. at 585-86.
 
 
 16
 The plaintiffs initiated the present action in the Southern District of New York in November 1999 and filed an amended complaint in January 2000. The amended complaint asserts fifteen claims falling into three broad categories. Counts One through Six (collectively the "ATCA claims") seek civil damages under the ATCA to compensate for dangers caused by the gas leak disaster itself, and allege violations of various purported international norms of environmental, criminal, and human rights law. Counts Seven and Eight seek judgments of civil contempt and fraud in connection with Union Carbide's alleged failure to honor the conditions under which the Southern District of New York dismissed the consolidated class actions in Bhopal I.[3] Counts Nine through Fifteen (collectively the "additional environmental claims") seek monetary and equitable relief under various common-law theories for environmental harms allegedly attributable to the UCIL plant in Bhopal but not related to the gas leak disaster. This case, too, was assigned to Judge Keenan.
 
 
 17
 Union Carbide and Anderson filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or for summary judgment pursuant to Fed. R. Civ. P. 56, and for an order denying class certification pursuant to Fed R. Civ. P. 23(c). The plaintiffs responded with cross-motions to strike the defendants' dispositive motions and affirmative defenses pursuant to the fugitive disentitlement doctrine.
 
 
 18
 In an order dated August 28, 2000, the district court granted the defendants' motions to dismiss in their entirety and denied the plaintiffs' cross-motions. See Bano v. Union Carbide Corp., No. 99 Civ. 11329 (JFK), 2000 WL 1225789, 2000 U.S. Dist. LEXIS 12326 (S.D.N.Y. Aug. 28, 2000). The court concluded: (1) that the fugitive disentitlement doctrine does not prevent the defendants from defending this action; (2) that the Bhopal Act deprives the plaintiffs of standing to maintain claims related to the Bhopal disaster; and (3) in the alternative, that the 1989 settlement orders, as modified by the Supreme Court of India, bar all claims related to the disaster. Without specifically addressing the additional environmental claims, the court ordered the entire case closed and removed from the docket.
 
 
 19
 This appeal followed.
 
 DISCUSSION
 I. Fugitive Disentitlement Doctrine
 
 20
 We begin by affirming the district court's denial of the plaintiffs' cross-motions based on the fugitive disentitlement doctrine. The plaintiffs contended in their original cross-motions that the defendants, although present before the district court, are fugitives from criminal prosecution in India, and should therefore be barred from "calling upon the resources of [the District] Court to determine [their] motion[s]." Notice of Pls.' Cross-Mot. to Strike dated Feb. 14, 2000, at 2. On appeal, the plaintiffs characterize their motions not as seeking to bar the defendants from appearing or raising any defense in this action on forum non conveniens grounds, but only as seeking to prevent defendants from "invok[ing] in their defense the law and judicial processes of the very jurisdiction whose law they have flouted by fleeing prosecution." Appellants' Reply Br. at 6.
 
 
 21
 The law of fugitive disentitlement, enabling courts to refuse to hear assertions made on behalf of fugitives from justice because of their fugitive status, is based on the inherent power of federal courts "to protect their proceedings and judgments in the course of discharging their traditional responsibilities." Degen v. United States, 517 U.S. 820, 823 (1996). We have applied the doctrine to dismiss appeals in both criminal and "a variety of civil cases and proceedings." Empire Blue Cross & Blue Shield v. Finkelstein, 111 F.3d 278, 280 (2d Cir. 1997) (collecting cases).
 
 
 22
 We review a district court's determination whether to apply the fugitive disentitlement doctrine for abuse of discretion. United States v. Morgan, 254 F.3d 424, 426 (2d Cir. 2001) (per curiam). We hold that the district court did not abuse its discretion because it correctly concluded that the doctrine is inapplicable here.
 
 
 23
 We have articulated four rationales for applying the fugitive disentitlement doctrine: "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape." Finkelstein, 111 F.3d at 280 (citing Bar-Levy v. United States Dep't of Justice, 990 F.2d 33, 35 (2d Cir. 1993)). No case has been called to our attention, and we have found none ourselves, in which the doctrine was applied by a court of the jurisdiction to which, rather than from which, the alleged fugitive had fled. That is not surprising. Because the purpose of the doctrine is to allow courts "to protect their proceedings and judgments," Degen 517 U.S. at 823, a court will ordinarily employ it only to ensure the enforceability of its decisions; to discourage flouting its process; to discourage flights from its administration of justice; or to avoid prejudice to the other side affecting litigation that is or may be before it.[4]
 
 
 24
 The Supreme Court's decision in Ortega-Rodriguez v. United States, 507 U.S. 234, 249 (1993), is instructive. There, a convicted criminal had fled the jurisdiction of a federal district court and been sentenced in absentia as a result. He was then recaptured and appealed his sentence. The court of appeals dismissed his appeal under the fugitive disentitlement doctrine. The Supreme Court reversed, holding that disentitlement was improper because the defendant was in custody during the course of his appeal. The Court rejected "the faulty premise that any act of judicial defiance, whether or not it affects the appellate process, is punishable by appellate dismissal." Id. at 250, 113 S. Cct. 1199. Rather, the Court held, disentitlement is justified only where there is "some connection between ... fugitive status and [the fugitive's] appeal." Id. at 249, 113 S. Ct. 1199; Morgan, 254 F.3d at 427 (noting that disentitlement requires "a sufficient nexusexists between the defendant's fugitive status and the... proceeding" in which disentitlement is sought) (citing Ortega-Rodriguez, 507 U.S. at 249). Because the defendant in Ortega-Rodriquez had "flouted the authority of the District Court, not the Court of Appeals... , it[was] the District Court that [had] the authority to defend its own dignity, by sanctioning an act of defiance that occurred solely within its domain." 507 U.S. at 246. The court of appeals thus did not have the power to dismiss the action in aid of the dignity of the district court, from which the defendant had fled, at least where the defendant's former fugitive status had no material impact on the proceeding in the court in which disentitlement was sought. Id.; see also Degan, 517 U.S. at 825-29 (holding that defendant's flight from criminal prosecution did not justify disentitlement in related civil proceeding absent any impact on the course of such proceeding or the enforceability of any judgment therein).
 
 
 25
 Here, similarly, there is no basis for a finding that the "act of judicial defiance," the defendants absconding from India, "affects the... process" of the district court. Ortega-Rodriquez, 507 U.S. at 250. There is no question about the enforceability of any judgment the district court may render against the defendants; the defendants' alleged flight from justice has imposed no discernible prejudice upon the plaintiffs in this proceeding; and the defendants are not alleged to have fled the jurisdiction of any court with jurisdiction over this action. There is therefore an insufficient nexus between the defendants' alleged fugitive status and the proceedings in the district court to support the court's use of fugitive disentitlement to deprive the defendants of their full right to appear in and defend this action.
 
 
 26
 Of course, the courts of India and the Indian government may have a legitimate interest in preventing or responding to the flight of the defendants and others from India and the jurisdiction of its courts. But, to paraphrase Ortega-Rodriguez, the defendants at most flouted the authority of the courts of India, not the Southern District of New York. It is the courts of India (augmented perhaps by the powers of the Indian government under, inter alia, treaties with the United States), not the United States District Court for the Southern District of New York, that would have the authority in this case to defend their own dignity by sanctioning the defendants' alleged acts of defiance, which occurred solely within their domain. The district court was correct in recognizing that it had no authority to protect the dignity, efficiency, or efficacy of the courts of India by employing a doctrine that arises out of the court's power to protect its own dignity, efficiency, and efficacy.
 
 II. The ATCA Claims
 
 27
 The defendants sought dismissal of the ATCA claims on three grounds: that they were fully litigated and settled in India; that the Bhopal Act deprived the plaintiffs' of standing to seek remedies for the disaster; and that the complaint failed to allege a violation of well-established norms of international law as required under the ATCA. Because we agree with the first contention, we need not reach the latter two.
 
 
 28
 The 1989 settlement orders, as modified by the Supreme Court of India, were meant "finally [to] dispose of" all claims "arising out of, related to or connected with the Bhopal Gas Leak Disaster." Union of India I, A.I.R. 1990 S.C. at 276; see also Union of India II, A.I.R. 1992 S.C. at 309 (affirming the relevant aspects of the 1989 settlement orders). On its face, then, the settlement appears plainly to cover the plaintiffs' ATCA claims.
 
 
 29
 The plaintiffs do not contest the validity of the 1989 settlement orders -- they do not contend that India did not have the right to represent the Bhopal disaster claimants,[5] or that the settlement was not entered into in good faith or was a sham or fraudulent in any way. Nor do the plaintiffs assert that the orders should not be given effect in United States courts. They argue instead that the settlement does not bar their ATCA claims. First, they assert that those claims seek "civil remedies pertaining to the [defendants'] unaddressed criminal liability" and thus fall outside the ambit of the settlement. Second, they contend that the defendants materially breached the settlement agreement, which therefore has no preclusive effect in this case.
 
 
 30
 A. Civil Liability for Criminal Acts.
 
 
 31
 In arguing that their ATCA claims fall outside the ambit of the settlement, the plaintiffs rely principally on language from the Supreme Court of India's decision in Sahu, which upheld the constitutionality of the Bhopal Act. The Court stated that while the Bhopal Act appointed the Indian government as the exclusive representative of Bhopal victims in civil actions, it did not "curtail[] . . . any right with respect to any criminal liability" or "deal with . . . claims or rights arising out of such criminal li[a]bility." Sahu, A.I.R. 1990 S.C. at 1529. The plaintiffs interpret this language to mean that the Indian government was not empowered by the Bhopal Act to litigate "claims . . . arising out of such criminal li[a]bility," and thus the settlement does not encompass such claims. Id. And because the ATCA claims are "based on [the defendants'] criminal liability under international law," those claims are not barred by the settlement. Appellants' Br. at 38.
 
 
 32
 We disagree. We understand the "claims . . . arising out of such criminal li[a]bility" left open in Sahu to be the rights under Indian criminal law of victims of criminal misconduct to obtain restitution from the wrongdoer. As part of a criminal sentence, an Indian court may order a defendant to pay a fine in the form of "payment to any person of compensation for any loss or injury caused by the offence, when compensation is, in the opinion of the Court, recoverable by such person in a Civil Court[.]" Indian Code Crim. Proc. 357(1)(b). In fact, the Bhopal District Court has granted some of the group plaintiffs in this case standing to act as "Intervenors Assisting the Prosecution" in the criminal proceedings against the defendants, based in part on their interest in obtaining such restitution.
 
 
 33
 In other words, the portion of Sahu on which the plaintiffs rely holds only that the Bhopal Act, and thus the settlement, does not prevent disaster victims from receiving their share of restitution imposed as a criminal penalty. But such "claims . . . arising out of such criminal li[a]bility" are not the ATCA claims being asserted in this case. The ATCA confers upon the district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. 1350 (emphasis added). Thus, the right retained by the Bhopal victims to pursue restitution under Indian criminal procedure law can hardly be said to encompass a right to pursue civil remedies under the ATCA for violations of international law.
 
 
 34
 On the contrary, the Bhopal Act and the 1989 settlement orders make it clear that the settlement precludes the sort of claims brought by the plaintiffs under the ATCA. Section 3 of the Act grants the Indian government the exclusive right to represent the disaster victims in all "claim[s]" related to the disaster.[6] Section 2(b)(i) of the Act broadly defines the term "claim" to include claims "arising out of, or connected with, the disaster, for compensation or damages for any loss of life or personal injury which has been, or is likely to be, suffered."[7] In Sahu, the Supreme Court of India interpreted this provision to reach "all claims" for damages due to loss of life or personal injury related to the disaster. A.I.R. 1990 S.C. at 1529 (emphasis added). Sahu further characterized the Act's "use of the expression 'claim' for all purposes" as "categorical and clear." Id. at 1533 (emphasis added).
 
 
 35
 The language of the settlement is equally broad. The 1989 settlement orders were meant
 
 
 36
 finally [to] dispose of all past, present and future claims, causes of action and civil and criminal proceedings (of any nature whatsoever wherever pending) by all India Citizens and all public and private entities with respect to all past, present and future deaths, personal injuries, health effects, compensation, losses, damages and civil and criminal complaints of any nature whatsoever... arising out of, relating to or connected with the Bhopal Gas Leak Disaster . . . .
 
 
 37
 Union of India I, A.I.R. 1990 S.C. at 276. The Supreme Court of India subsequently revised this order by allowing the criminal prosecution to go forward. See Union of India II, A.I.R. 1992 S.C. at 309. Crucially, however, it otherwise left the settlement orders "undisturbed." Id.
 
 
 38
 We note, finally, that it is axiomatic that the law encourages settlement of disputes. See, e.g., Williams v. First Nat'l Bank, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts . . . ."); Anita Founds. Inc. v. ILGWU Nat'l Ret. Fund, 902 F.2d 185, 190 (2d Cir. 1990) ("Courts are wary of disturbing settlements, because they represent compromise and conservation of judicial resources, two concepts highly regarded in American jurisprudence."); cf. Gavoni v. Dobbs House, Inc., 164 F.3d 1071, 1077 (7th Cir. 1999) (explaining that "financial and judicial economy are at [the] core" of Fed. R. Civ. P. 68, which governs offer-of-judgment proceedings); Manko v. United States, 87 F.3d 50, 54 (2d Cir. 1996) (noting that "[t]he primary purpose" of Fed. R. Evid. 408, which provides that certain evidence of settlement offers and negotiations is inadmissible, "is the promotion of the public policy favoring the compromise and settlement of disputes that would otherwise be discouraged with the admission of such evidence.") (internal quotation marks omitted). The public interest in amicable resolution of cases is particularly strong in the context of mass tort and similar litigation. See In re Exxon Valdez, 229 F.3d 790, 795 (9th Cir. 2000) ("[T]he general policy of federal courts to promote settlement before trial is even stronger in the context of largescale class actions."); In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 805 (3d Cir. 1995) (noting "the urgency of [the public] policy [favoring settlements] in complex actions that consume substantial judicial resources and present unusually large risks for the litigants.").
 
 
 39
 Union Carbide bargained "finally [to] dispose of" all claims "arising out of, relating to or concerned with the Bhopal Gas Leak Disaster." Union of India I, A.I.R. 1990 S.C. at 276. Were we to allow the plaintiffs' action against the defendants to proceed without clearer proof that it is not covered by the settlement agreement, we would not only fail to vindicate the reasonable expectations of Union Carbide, we would risk undermining the ability of defendants generally to gauge in advance the finality of settlements, and might thereby jeopardize the effective and efficient settlement of future claims arising from other disasters.
 
 
 40
 B. Union Carbide's Alleged Breaches.
 
 
 41
 The plaintiffs next contend that the settlement can have no preclusive effect in this case because Union Carbide materially breached it by (1) refusing to submit to criminal prosecution and (2) failing to pay for a new hospital in Bhopal. Again we disagree.
 
 
 42
 1. Criminal Prosecution. In addition to disposing of all civil claims related to the disaster, the 1989 settlement orders directed that "all criminal proceedings related to and arising out of the disaster shall stand quashed." Union of India I, A.I.R. 1990 S.C. at 275; see also id. at 276. In Union of India II, the Supreme Court of India revisited the issue of criminal prosecution. The Court left the 1989 settlement orders undisturbed as to the terms of settlement but reversed its prior position with respect to criminal prosecution, holding that "the quashing of the criminal proceedings was not justified. The criminal proceedings are, accordingly, directed to be proceeded with." Id. at 312.
 
 
 43
 We understand the plaintiffs to make the following argument: (1)Union Carbide provisionally agreed in 1989 to settle the civil claims against it in part in reliance on the Indian government's offer to quash the criminal prosecution as part of the settlement. (2) The Supreme Court later struck down that provision of the settlement agreement in Union of India II and effectively fashioned a new settlement, a mandatory term of which was that the criminal prosecution would proceed against Union Carbide. (3) The Court then gave Union Carbide a chance to reject the new terms and withdraw from the settlement. Having declined this invitation, Union Carbide implicitly acceded to the revised terms including the requirement that it appear in the criminal proceedings. (4) Therefore, Union Carbide's subsequent refusal to submit to criminal prosecution constitutes a material breach of the revised settlement agreement.
 
 
 44
 We disagree with the conclusion of plaintiffs' argument. The revised settlement order simply vacated the prior quashing order and directed the prosecuting authorities to proceed. There is nothing in it or anything else that Union Carbide did or said from which it can be inferred that the company agreed to answer criminal charges in India. In failing to appear, Union Carbide thus did not breach any contractual commitment to which it was bound.
 
 
 45
 In addition, the three steps of the plaintiffs' argument upon which the conclusion is based are flawed. The first two proceed from the erroneous assumption that forbearance from criminal prosecution was a material term of the settlement agreement memorialized in the 1989 settlement orders, and consequently that the submission to such prosecution was a material term in the 1991 version. The Supreme Court of India held to the contrary in both Sahu and Union of India II.
 
 
 46
 In Sahu, the Court held that the Bhopal Act "does not deal with any question of criminal liability of any of the parties concerned." A.I.R. 1990 S.C. at 1529. The Court noted that its quashing of criminal proceedings in the 1989 settlement orders was premised not on the Bhopal Act but on the Supreme Court of India's "plenary powers" under Article 142 of the Indian Constitution. Id. Accordingly, the Court stated that the portions of the 1989 settlement orders dealing with criminal prosecution "are not consideration which induced the parties to enter into settlement." Id.
 
 
 47
 In Union of India II, the Court rejected the argument that the 1989 settlement was invalid under the Indian law "doctrine of stifling of prosecution." A.I.R. 1992 S.C. at 285. That doctrine holds that criminal charges that "are matter[s] of public concern cannot be [the] subject matter of private bargain and compromise." Id. Thus, "a contract to withdraw a prosecution in respect of [certain crimes]... is founded on an illegal consideration." Id. at 286 (citation and internal quotation marks omitted). The Supreme Court of India concluded that the "doctrine of stifling of prosecution" had no bearing on the settlement because "the dropping of criminal charges" did not constitute consideration for Union Carbide's agreement to the terms memorialized in the 1989 settlement orders. Id. at 285. In other words, "no part of the consideration for [the settlement agreement] was unlawful." Id. at 288. Sahu and Union of India thus make clear that while the Supreme Court's orders addressed both civil and criminal proceedings related to the Bhopal disaster, the defendants' civil and criminal liability were separate issues and the settlement of the former was independent of the Supreme Court's disposition of the latter.
 
 
 48
 The second step of the plaintiffs' argument -- that Union of India II materially revised the settlement by allowing the criminal prosecution to go forward, and that validity of the settlement so revised was contingent on Union Carbide's submission to that prosecution -- fails for the same reason. Union of India II held that the civil settlement was valid precisely because Union Carbide's obligations were legally independent of any promise by the Indian government to refrain from criminal prosecution. The removal from the 1989 settlement orders of the quashing of criminal prosecution therefore did not affect the terms of settlement. Accordingly, neither Union of India II nor any order or agreement makes any party's performance under the settlement agreement conditional upon the defendants' submission to the criminal jurisdiction of Indian courts.
 
 
 49
 The third step of the plaintiffs' argument is premised on another misinterpretation of Union of India II. The Supreme Court of India did not, as the plaintiffs assert, invite Union Carbide to withdraw from the settlement and recover monies it had already tendered if it found the revised terms, including a requirement to appear as a criminal defendant, unacceptable. Rather, the Court stated that Union Carbide would be entitled to restitution of these monies "if the settlement is set aside." A.I.R. 1992 S.C. at 313 (emphasis added). The settlement was never set aside. It remained in effect, without any provision relating to Union Carbide's appearance in India to defend criminal charges against it.
 
 
 50
 2. The Bhopal Hospital Trust. The plaintiffs next contend that Union Carbide breached the settlement agreement by failing to use its own funds to pay for the establishment of a hospital in Bhopal. We agree with the district court that the settlement agreement did not require Union Carbide to pay for the hospital, and that Union Carbide's conduct with respect to that funding therefore did not constitute a breach. See Bano, 2000 WL 1225789, at *14, 2000 U.S. Dist. LEXIS 12326, at *41-*42.
 
 
 51
 The Supreme Court of India made it entirely clear in Union of India II that Union Carbide was never under any legal obligation to fund the hospital. The Court noted that Union Carbide had "offered" to fund the hospital, but that this offer was never made a part of the formal settlement. Union of India II, A.I.R. 1992 S.C. at 310 (emphasis added). While expressing its "hope" that Union Carbide would "not be found wanting in this behalf," and stating that Union Carbide "should" fulfill its offer on the basis of "humanitarian considerations," the Court concluded that it lacked authority to "re-shape the settlement or restructure its terms" by mandating that Union Carbide pay for the hospital. Id. (emphasis added); see also id. at 313. In a subsequent order, the Court expressly recognized that the parties had "contemplated that [the hospital] should be the endeavor of [Union Carbide] and the UCIL on humanitarian grounds rather than on purely legal grounds." Union Carbide Corp. v. Union of India, Order of Dec.1, 1995, at 4.
 
 
 52
 True, Union Carbide did provide funding for a hospital in the form of the Bhopal Hospital Trust. It funded the Trust by selling its shares in UCIL, a sale which netted the equivalent of $90 million dollars. Before this transaction, the Bhopal District Court had threatened to attach Union Carbide's remaining assets in India, which consisted solely of its equity in UCIL, in connection with the criminal prosecution. Union Carbide sold the shares and transferred the proceeds to the Trust before the attachment order was issued. The Bhopal court declared that the sale of shares to fund the Trust was a fraudulent conveyance designed principally to avoid prosecution.
 
 
 53
 The plaintiffs contend on this basis that the manner in which Union Carbide funded the trust constituted a breach of its obligations under the settlement agreement. Having concluded that the settlement agreement did not require Union Carbide to establish the trust in the first instance, however, we cannot agree that Union Carbide breached the settlement agreement through the manner in which it funded the trust.
 
 III. Additional Environmental Claims
 
 54
 Counts Nine through Fifteen of the amended complaint seek recovery under various common-law theories for environmental damage in Bhopal allegedly unrelated to the Bhopal gas disaster. Although the defendants moved to dismiss, for summary judgment, or to deny class certification as to these claims, the district court dismissed the entire complaint and ordered the case closed without addressing them. See Bano, 2000 WL 1225789, at *15, 2000 U.S. Dist. LEXIS 12326, at *42.
 
 
 55
 We review de novo a district court's decision either to dismiss a complaint for failure to state a claim, see Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000), or to grant summary judgment, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), cert. denied, 529 U.S. 1098 (2000). We might therefore address these questions now on the basis of the record before us and the other submissions on appeal. See Jackson v. Burke, 256 F.3d 93, 95-96 (2d Cir. 2001) (per curiam) (deciding on appeal the propriety of summary judgment in the district court despite the district court's failure to state its reasons for granting the motion because "the submissions of the parties provide[d] us with a sufficient basis" to do so). We are nonetheless confident, particularly in light of Judge Keenan's extensive and intimate familiarity with the Bhopal disaster litigation, that we would benefit from his consideration of these issues in the first instance. Cf. Beckford v. Portuondo, 234 F.3d 128, 130 (2d Cir. 2000) (explaining reasons for looking to the district court for initial analysis on motion for summary judgment). We therefore remand the case to permit him to do so.
 
 IV. Environmental Claims Against Anderson
 
 56
 In addition to joining Union Carbide's arguments on appeal, Anderson also seeks affirmance on the grounds that the complaint fails to allege that he was personally involved in any misconduct. Because we conclude that the ATCA claims were properly dismissed, we address Anderson's arguments only with respect to the additional environmental claims.
 
 
 57
 Under New York law, "a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of the corporation, may be held individually liable." Lopresti v. Terwilliger, 126 F.3d 34, 42 (2d Cir. 1997) (citation and internal quotation marks omitted). The amended complaint is vague at best in describing Anderson's role, if any, in creating the contamination on which the additional environmental claims are based. Those claims refer to "defendants" in the plural, but the specific factual allegations mention only conduct by Union Carbide. In its general factual allegations, however, the amended complaint asserts that Anderson exercised significant direct control over management of the Bhopal plant, including control over safety procedures. The plaintiffs submitted at least some evidence to support these allegations in response to the defendants' motions for summary judgment.
 
 
 58
 The district court's opinion gives no indication of the standard by which it dismissed the claims against Anderson or the aspects of the complaint or factual record it relied on to support that dismissal. We are therefore unable to review that ruling on the present appeal, and our remand of the additional environmental claims applies to both Union Carbide and Anderson.
 
 CONCLUSION
 
 59
 For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 As we noted in Bigio v. Coca-Cola Co., 239 F.3d 440, 443 n.1 (2d Cir. 2000), "[w]e have also referred to this statute as the 'Alien Tort Statute,' see, e.g., Wight v. Bankamerica Corp., 219 F.3d 79, 91 (2d Cir. 2000) (internal quotation marks and citation omitted), and the 'Alien Tort Act,' see, e.g., Jota v. Texaco, Inc., 157 F.3d 153, 156 (2d Cir. 1998) . . . ."
 
 
 [2]
 Article 142 of the Constitution of India provides in part:
 Enforcement of decrees and orders of Supreme Court and orders as to discovery, etc.
 (1) The Supreme Court in the exercise of its jurisdiction may pass such decree or make such order as is necessary for doing complete justice in any cause or matter pending before it . . . .
 
 
 [3]
 The plaintiffs do not contest the dismissal of Counts Seven and Eight on this appeal.
 
 
 [4]
 Neither the Supreme Court nor this Court has established a blanket rule against disentitlement by a court or in a proceeding other than the one from which the party to be sanctioned is a fugitive. See Ortega-Rodriquez v. United States, 507 U.S. 234, 249 (1993) (noting that a defendant's fugitive status, "though [it] occur[s] while his case is before the district court, might have an impact on the appellate process sufficient to warrant an appellate sanction"); Finkelstein, 111 F.3d at 282 (dismissing appeal by fugitive in part because any judgment rendered by district court after remand would be unenforceable).
 
 
 [5]
 Amici curiae do allege that there are "[s]erious problems with the adequacy of India's representation of the victims' interests." Amici Curiae Br. at 6 n.3. They premise this claim on the allegation that the Indian government "owned a substantial portion" of UCIL. Id. The Supreme Court of India, however, rejected a similar argument in affirming the validity of the 1989 settlement orders. It concluded that the Indian government "[did] not own any share in UCIL," but rather that the ownership share attributed to the government -- which amounted to 20.12 percent of UCIL's equity -- was in fact held by "statutory independent organisations" over which the Government exercised insufficient control to raise any conflict of interest as to the government's representation of the Bhopal victims. Sahu, A.I.R. 1990 S.C. at 1537. Amici have offered no reason for us to doubt this conclusion.
 In any event, because it was raised by amici, not by the appellants themselves, and because it apparently was not raised by any party before the district court, we do not reach the question whether the Indian government properly represented the interests of the Bhopal victims in negotiating the settlement. See Singleton v. Wulff, 428 U.S. 106, 120 (1976) (courts of appeal need not consider issues raised for the first time on appeal); Resident Council of Allen Parkway Vill. v. U.S. Dep't of HUD, 980 F.2d 1043, 1049 (5th Cir. 1993) ("[A]n amicus curiae generally cannot expand the scope of an appeal to implicate issues that have not been presented by the parties to the appeal."); 16A Wright et al., Federal Practice and Procedure: Jurisdiction 3975.1 (3d ed. 1999) ("In ordinary circumstances, an amicus will not be permitted to raise issues not argued by the parties.").
 
 
 [6]
 Section 3 of the Bhopal Act states in pertinent part:
 3. Power of Central Government to represent claimants.
 (1) . . . [T]he Central Government shall, and shall have the exclusive right to, represent, and act in place of (whether within or outside India) every person who has made, or is entitled to make, a claim for all purposes connected with such claim in the same manner and to the same effect as such person.
 (2) In particular and without prejudice to the generality of the provisions of subsection (1), the purposes referred to therein include
 (a) Institution of any suit or other proceeding in or before any court or other authority (whether within or outside India) or withdrawal of any such suit or other proceeding, and
 (b) entering into a compromise.
 
 
 [7]
 Section 2(b) of the Act defines a "claim" as:
 (i) a claim, arising out of, or connected with, the disaster, for compensation or damages for any loss of life or personal injury which has been, or is likely to be, suffered;
 (ii) a claim, arising out of, or connected with, the disaster, for any damage to property which has been, or is likely to be, sustained;
 (iii) a claim for expenses incurred or required to be incurred for containing the disaster or mitigating or otherwise coping with the effects of the disaster;
 (iv) any other claim (including any claim by way of loss of business or employment) arising out of, or connected with, the disaster.