**DMJ ASSOCIATES, L.L.C., Plaintiff,**

**v.**

**Carl A. CAPASSO, et al., Defendants.**

**No. 97–CV–7285(RJD)(RML).**

United States District Court,
E.D. New York.

June 11, 2002.

**224**

Lea Leadbeater, Barbara B. Guibord, Fogani, Guibord, Homsy & Roberts, Chicago, IL, Elizabeth Miller, Fogani, Guibord, Homsy & Roberts, New York, NY, Michael Goodstein, Resolution Law Group, P.C., Washington, DC, for DMJ Associates, L.L.C., Plaintiff.

Bonnie Fine Kaufman, Hale and Dorr, L.L.P., Washington, DC, Robert R. Leinwand, Robinson, Brog, Leinwand, Greene, Genovese & Gluck, P.C., New York, NY, Irvin M. Freilich, Robinson, Freilich, Bruno & Cohen, Newark, NJ, Dianne Bresee Mayberger, O'Connor, O'Connor, Mayberger & First, Albany, NY, Daniel E. Katz, Bauman, Katz & Grill, LLP, New York, NY, Eric Dessen, James J. Dixon, Consolidated Edison Company of NY, New York, NY, Russell W. Mahler, Madison, CT, Norman W. Bernstein, Ted Snyder, N.W. Bernstein & Associates, New York, NY, Thomas Sabino, Wolff & Samson, P.A., Roseland, NJ, Michael Zaitz, Vison & Elkins, L.L.P., New York, NY, David Schneider, Bressler, Amery & Ross, P.C., Florham Park, NJ, Reed W. Neuman, Howrey & Simon, Washington, DC, Allen G. Reiter, Sonnenschein Nath & Rosenthal, New York, NY, Hershel J. Richman, Christopher M. Roe, Dechert Price & Rhoads, Philadelphia, PA, Daniel C. Malone, Dechert Price & Rhoads, New York, NY, Patrick J. Conlon, Exxon Mobil Corporation, Clinton Township, NJ, Joseph T. Walsh, III, McCuster, Aneslmi, Rosen, Carvelli & Walsh, Chatham, NJ, for Chemical Leaman Tank Lines, Carl A. Capasso, Stanley Works, Inc, Hitchcock Gas Engine Company, Review Supplies, Inc, Nanco Contracting Corp, Underground Equipment Co. Ltd, Consolidated Edison of NY, Russell W. Mahler, General Dynamics Corporation, Powell Duffryn Terminals, Inc, Rockwell International Corp., Basf Corporation, Clairol, Incorporated, Quanta Resource Corporation, Darling International, Inc, Exxon Corporation, Defendants.

## MEMORANDUM AND ORDER

LEVY, United States Magistrate Judge.

By Notice of Motion dated January 23, 2002, the Generator defendants[1] moved for a stay of this action pending completion of a remedial investigation and feasibility study ("RI/FS") to be undertaken at the Quanta Resources site in Long Island City, New York (the "Quanta site") by the New York State Department of Environmental Conservation ("DEC") pursuant to a consent order soon to be finalized with approximately twenty-four companies, including but not limited to many of the defendants in this case. Defendant Quanta Resources Corporation ("Quanta")

---

1. The Court assumes familiarity with the identities of the various parties.

subsequently joined in the Generator defendants' motion. Collectively, these defendants ("movants") seek a stay of this action on grounds of primary jurisdiction, *Burford* abstention, and the court's inherent ability to manage its docket. Plaintiff DMJ Associates ("plaintiff" or "DMJ") opposes the motion as contrary to congressional intent and improperly delaying the ultimate resolution of its long-pending claims. DMJ further complains that, because it is not a party to the proposed DEC consent order, it would have no meaningful role in developing a work plan that protects its interests.

Defendant Darling International, Inc. ("Darling") objects that its interests would also not be safeguarded in the RI/FS process, as it too is not a party to the proposed consent order with DEC. Unlike the claims against the movants, which stem from their activities at the Quanta site, plaintiff's claims against Darling involve the release of contaminants on the Capasso Property[2] itself. Darling also opposes any stay that would prevent the completion of Phase 1 discovery as to the claims against Darling and delay Darling's anticipated motion for summary judgment.

Plaintiff additionally moves to modify the Case Management Order to allow the beginning of Phase 2 document discovery while the parties are completing Phase 1 discovery. Movants and Darling object, arguing that Phase 2 discovery as to the sources of contamination should be delayed until "the extent and nature of the contamination ... and any endangerment there from" has been established through

the completion of Phase 1 discovery and the RI/FS process. (*See* Case Management Order No. 1 ("Case Management Order" or "the Order") ¶ IA(1).)

## BACKGROUND

On December 10, 1997 plaintiff filed this imminent and substantial endangerment citizen's suit under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a) to require defendants to conduct an investigation to establish, *inter alia*, the nature and extent of potential endangerment on the Capasso Property and implement an appropriate abatement plan. The complaint also includes claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*,[3] and state common law nuisance.[4] On August 14, 2000, plaintiff filed an amended complaint with somewhat different parties; the causes of action remain the same.

Plaintiff alleges that the Capasso Property has been contaminated through the release of hazardous materials directly on the Capasso Property as well as through the migration of hazardous materials from the Quanta site to the Capasso Property. Specifically, plaintiff claims that Darling released harmful chemical solvents on the Capasso Property and that the Generator defendants and Quanta are responsible for a plume of oil and hazardous substances emanating from the Quanta site that is now endangering the Capasso Property. On June 14, 2000, the court entered a Case Management Order which provides for phased discovery. Phase 1 focuses on the

---

**2.** The Capasso Property, in which plaintiff has a security interest, consists of the North Capasso property and the South Capasso property.

**3.** The CERCLA claim seeks to compel an environmental investigation and cleanup and to recover response costs.

**4.** The common law nuisance claim seeks an order requiring defendants to either (1) fund plaintiff's development of an abatement plan or (2) fund and implement their own, court-approved plan to abate a public nuisance at the Capasso Property.

nature and extent of contamination at the Capasso Property, while Phase 2 examines the sources of the alleged contamination, including historical operations by Quanta and Darling, and the Generator defendants' arrangements for disposal and Phase 3 focuses on possible remedies. Discovery to date has been limited to Phase 1.

## THE DEC PROCESS

At the court's invitation, DEC representatives appeared at oral argument on March 13, 2002 to explain the nature of DEC's proposed involvement at the Quanta site, the anticipated length of the RI/FS process, the impact of the RI/FS on the Capasso Property, and the agency's views of any potential conflict caused by the continuation of this litigation while the RI/FS is underway.

According to DEC, the RI/FS consists of a remedial investigation and a feasibility study conducted pursuant to a consent order between potentially responsible parties at the Quanta site and DEC. The projected remedial investigation, also known as a site characterization, would determine the nature and extent of contamination at the Quanta site, as well as any off-site ramifications, including whether there is a plume of hazardous material that has migrated to the Capasso Property. (Transcript of Oral Argument held March 13, 2002 ("Tr.") at 70.)

At the time of argument, DEC was evaluating a proposed consent order signed by a number of potentially responsible parties, including the Generator defendants and Quanta (collectively, "respondents"). Under the consent order, respondents would submit a draft RI/FS work plan for the Quanta site for DEC approval within

120 days of the effective date of the order. (Tr. at 69; proposed Order on Consent, ¶ IIB1(a), submitted at the March 13, 2002 hearing.) As DEC explained, there will be "one comprehensive investigation work plan that's approved by DEC in conjunction with the Department of Health." (Tr. at 62.) DEC will make the final decision as to what is included in the work plan and which data will be considered. Respondents will bear the costs of the testing. (Tr. at 69.) Because they are not parties to the order, plaintiff and Darling will have no role in the formulation or approval of the work plan, but will receive notice and an opportunity to comment as part of a citizen participation plan. (Tr. at 63, 66.) Although DEC has no obligation to meet with non-parties or to respond to their comments in writing (Tr. at 63), it agreed to consider plaintiff's and Darling's concerns and, if appropriate, include them in the work plan, but took pains to explain that DEC would have the ultimate say over every aspect of the plan. (Tr. at 66.) Once a work plan has been approved, respondents will be required to submit a monthly report of their activities to DEC. (Tr. at 67.) The agency estimated the remedial investigation would be completed approximately seven months after final approval of the work plan. (Tr. at 70.)

The feasibility study, which considers possible remedies where contamination is found, would take another five months. (*Id.*) Respondents are free to opt out of the remedial program after the completion of the feasibility study. (Tr. at 64.) All told, DEC estimated that the RI/FS process would take between fourteen and fifteen months from the March 13, 2002 argument date to complete.[5] (Tr. at 70.)

---

**5.** Plaintiff believes that the DEC estimate is optimistic and estimates that the RI/FS will take considerably longer.

At issue in the pending motions is a request to stay Phase 1 discovery until the completion of the RI/FS. In relevant part, Phase 1 discovery examines "the extent and nature of any contamination ... on and around the Capasso Property and any endangerment there from, as well as the extent and nature of the contamination alleged ... on the nearby Quanta LIC property." (Case Management Order No. 1, dated June 14, 2000 ("Case Management Order")). In addition to written discovery requests and depositions, Phase 1 discovery includes sampling and data collection from ground wells placed in various locations on or near the Capasso Property. Plaintiff has already installed a number of monitoring wells and has obtained court approval for the installation of three more, which plaintiff desires to install without further delay. (*See* Order dated July 2, 2001.)

During oral argument, DEC emphasized that it took no position on the request for a stay or on the underlying legal arguments. (Tr. at 62.) However, DEC expressly stated that neither the continuation of the existing monitoring wells nor the installation of plaintiff's three additional wells would interfere with its investigation.[6] (Tr. at 68, 78.) Although DEC would "rather do its investigation and feasibility study unfettered by other investigations occurring on the site," (Tr. at 62), the DEC project manager on the Quanta site confirmed that this litigation would not disrupt the RI/FS process so long as DEC is not forced to accept data that is not autho-

rized by the approved work plan.[7] (Tr. at 78–79.)

## DISCUSSION

Movants note that the sole basis for plaintiff's claims for relief against them is an alleged plume of oil and hazardous substances that has migrated from the Quanta site and is purportedly endangering the adjacent Capasso Property. Whether such a plume exists and whether it has migrated from the Quanta site to the Capasso Property, they argue, is precisely what DEC will determine through the RI/FS process. Relying on the doctrines of primary jurisdiction and *Burford* abstention, as well as the Court's inherent authority to manage its docket, movants seek to stay this action until the RI/FS is completed. The court will examine each argument in turn.

## I. MOTION TO STAY THE ACTION

### A. *ABSTENTION*

A federal court has a general duty to adjudicate all controversies properly before it. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 821, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (describing "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"). Two narrow exceptions to this duty are the doctrines of primary jurisdiction and *Burford* abstention. The party requesting abstention bears the heavy burden of showing that abstention is warranted. *Morton College Bd. of Trustees v. Town of Cicero,*

---

6. DEC said it was likely that the existing wells would be incorporated into the final work plan (Tr. at 68), but could not confirm whether the three wells yet to be installed would also be included, stating only that they would be "considered" to the extent they are "appropriate." (*Id.*)

7. DEC's Quanta site project manager told the court that this litigation would not interfere with the RI/FS provided that DEC remains free to consider or reject data from plaintiff's wells as appropriate. (Tr. at 79.) The court would then decide what weight, if any, to give plaintiff's data and DEC's findings in this litigation. (Tr. at 79–80.)

18 F.Supp.2d 921, 924 (N.D.Ill.1998); *Illinois Pub. Interest Research Group v. PMC, Inc.*, 835 F.Supp. 1070, 1077 (N.D.Ill.1993).

### 1. *Primary Jurisdiction*

The doctrine of primary jurisdiction applies " 'where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. . . .' " *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2d Cir.1992) (quoting *United States v. Western Pac. R.R.*, 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). It is premised on the idea that, although Congress has not authorized an agency to decide *legal* issues presented by a case raising questions of federal law, "the agency's expertise may, nevertheless, prove helpful to the court in resolving difficult *factual* issues." *Id.* (*citing Western Pac. R.R.*, 352 U.S. at 66, 77 S.Ct. 161) (other citations omitted) (emphasis in original).

Movants' contentions are set forth in detail in their submissions and were amplified at length during oral argument. As described above, Phase 1 of the Case Management Order in this case centers on a determination of the nature and extent of any contamination at or affecting the Capasso site. Movants urge that this action should be stayed because the DEC investigation will make such a determination.[8] For one thing, they argue, DEC is the State regulatory agency empowered to enforce the complex of State environmental laws and regulations and has the expertise and independence to conduct such an investigation better than the parties to an adversarial proceeding. Movants also charge that plaintiff's testing is unscientific and biased. Raising the specter of conflicting decisions from the Court and DEC, movants contend that as a matter of law and sound judgment the Court should stay this action until the completion of the RI/FS.

DMJ argues that a stay would violate the clear intent of Congress to enable citizens to bring imminent and substantial endangerment claims under RCRA directly in federal court, where state and federal agencies have received timely notice but have failed to take specifically enumerated actions before a lawsuit is filed. DMJ contends that abstention is inappropriate where the prerequisites for filing a RCRA citizen's suit have been satisfied. Plaintiff further complains that it would be especially unfair to subordinate its right to bring this lawsuit in favor of a state proceeding from which it is excluded, as plaintiff would have no direct role in formulating either the work plan or the feasibility study. As a result, the RI/FS would not fairly reflect plaintiff's interests and concerns. Finally, plaintiff asserts that, at a minimum, it should be allowed to proceed on its causes of action for nuisance and for recovery of cleanup costs under CERCLA, which are not addressed by the RI/FS.

As explained above, Darling has no connection to the Quanta site. Plaintiff's claims against Darling involve the release of chemical solvents on the Capasso Property. Accordingly, Darling argues that abstention is inappropriate as to the claims against Darling, as they are not part of DEC's investigation of the Quanta site and will unnecessarily delay Darling's completion of discovery and filing a motion for summary judgment. Darling is also con-

---

8. Movants do not contend, however, that if the court abstains, it must then accept DEC's factual findings. They suggest that, after the stay is lifted, the court should give the results of DEC's investigation appropriate consideration.

cerned that, because it is not a party to the DEC consent order, it would be unfairly excluded from any meaningful participation in the RI/FS process.

In enacting RCRA, Congress expressly authorized citizens to bring imminent and substantial endangerment claims in the federal courts as "part of a comprehensive scheme designed to deal consistently with a serious national problem." *Williams v. Alabama Dep't of Transp.*, 119 F.Supp.2d 1249, 1256 (M.D.Ala.2000). *See* 42 U.S.C. § 6972(a) ("any person may commence a civil action on his own behalf"). Prior to filing a citizen's suit, a plaintiff must provide notice to the Environmental Protection Agency and appropriate state officials, to afford them the first opportunity to enforce the statute, and to potential defendants, to allow them to comply voluntarily with RCRA. *See* 42 U.S.C. § 6972(b). Once the notice periods have expired, a citizen is free to file a federal court action with certain narrow exceptions specifically enumerated in the statute. Thus, where action by a state agency is concerned,

> no [imminent and substantial endangerment citizen suit under RCRA] may be commenced if the State, in order to restrain or abate acts or conditions which may have contributed to ... the activities which may present the alleged endangerment-
>
>> (i) has commenced and is diligently prosecuting an action under subsection (a)(1)(B) of this section;
>>
>> (ii) is actually engaging in a removal action under section 104 of [CERCLA]; or
>>
>> (iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of [CERCLA] and is diligently proceeding with a remedial action under that Act ....

42 U.S.C. § 6972(b)(1)(C). Thus, Congress clearly intended citizen's suits to be an integral part of the enforcement efforts for this federal environmental law, supplementing where necessary the actions of state and federal agencies, and offering a judicial forum to avoid undue delay.

Relying on the statute's notice provisions and the explicit authorization to bring private suits if specific agency action is not forthcoming, the majority of courts that have addressed this issue have held that abstention is rarely, if ever, appropriate in a citizen's suit under RCRA. Although the Second Circuit has yet to rule on this question, the Seventh Circuit has held that abstention "would be an end run around RCRA. Congress has *specified* the conditions under which the pendency of other proceedings bars suit under RCRA ...." *PMC, Inc. v. Sherwin–Williams Co.*, 151 F.3d 610, 619 (7th Cir.1998) (emphasis in original), *cert. denied*, 525 U.S. 1104, 119 S.Ct. 871, 142 L.Ed.2d 772 (1999). *See also Williams*, 119 F.Supp.2d at 1256 (abstention inappropriate as "Congress indicated that federal courts should exercise jurisdiction and award appropriate relief in any cognizable cause of action under RCRA, except in narrow situations not relevant here.") In a related context, a number of courts have relied on the reasoning in *Sherwin–Williams* in finding abstention inappropriate in citizen's suits brought under the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, which has analogous provisions. *See, e.g., Anderson v. Farmland Indus., Inc.*, 45 F.Supp.2d 863, 868 (D.Kan.1999) ("find[ing] the reasoning of *Sherwin–Williams* persuasive," and refusing to abstain where, "[l]ike RCRA, the Clean Air Act expressly provides the conditions under which a citizen suit is barred" and those conditions did not apply).

The court finds this reasoning persuasive. By authorizing citizens to file private lawsuits under RCRA and narrow-

ly defining the conditions under which state or federal action can circumscribe that right, Congress clearly signaled that the federal courts have a duty to hear and decide these claims and carefully limited the deference courts should pay to the expertise of an administrative agency.

Defendants rely on two cases where abstention was held appropriate in a citizen's suit brought under RCRA. *See Friends of Santa Fe County v. LAC Minerals, Inc.,* 892 F.Supp. 1333, 1348–49 (D.N.M.1995); *Palumbo v. Waste Techs. Indus.,* 989 F.2d 156, 159 (4th Cir.1993). These cases are factually distinguishable. In both cases, the plaintiffs were essentially asking a federal court to review a permit decision already made by a state administrative agency. *Friends of Santa Fe County,* 892 F.Supp. at 1348; *Palumbo,* 989 F.2d at 160. However, to the extent the reasoning of these decisions conflicts with that expressed in *Sherwin–Williams,* this court respectfully disagrees. Accordingly, abstention on the grounds of primary jurisdiction is inappropriate in this case.

### 2. *Burford* Abstention

■ An "extraordinary and narrow exception" to a federal court's general duty to review all matters properly before it occurs when the court finds that "exceptional circumstances" exist in which the court should defer to important, countervailing state interests. *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). In *Burford v. Sun Oil Co.,* 319 U.S. 315, 332–34, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the Supreme Court held that a federal court should refrain from exercising jurisdiction (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or (2) where "the

exercise of federal review ... would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). *Burford* abstention is premised on the availability of timely and adequate state court review. *Id.*

This case presents no "difficult questions of state law." Quanta, however, alleges that the exercise of federal jurisdiction would disrupt DEC's efforts to investigate and remediate hazardous waste under its RI/FS process, a matter of substantial state concern. Specifically, Quanta contends that New York has developed a comprehensive hazardous waste management program which was approved by the United States Environmental Protection Agency and supercedes RCRA in New York. Quanta asks that the court stay this action until DEC has completed its investigation of the Quanta site and argues that the failure to do so would disrupt New York's efforts to implement a coherent environmental policy.

■ As explained above, plaintiff filed this case under the citizen's suit provision of RCRA, after providing statutory notice to state and federal agencies and waiting the prescribed length of time. 42 U.S.C. § 6972(b). When the relevant agencies did not initiate actions specifically enumerated in the Act, plaintiff was authorized to file this lawsuit in federal court. For the same reasons set forth in the discussion of primary jurisdiction above, a number of courts have found the enactment of the citizen's suit provision of RCRA to be an expression of Congress's intent that the federal courts should not abstain under *Burford* in RCRA actions, where plaintiffs have satisfied the conditions set forth in the Act. *See, e.g., Sherwin–Williams Co.,* 151 F.3d at 619; *Williams,* 119 F.Supp.2d

at 1256. As explained in more detail in the discussion of primary jurisdiction, this court finds these decisions persuasive and agrees that abstention is inappropriate where plaintiff has satisfied the prerequisites for filing a citizen's suit under RCRA.

Nor is there any evidence that the denial of a stay would interfere with the RI/FS or with the State's efforts to establish a coherent environmental waste policy. Again, DEC's position is telling. DEC has not asked this court to abstain on *Burford* or primary jurisdiction grounds. Nor has it requested that discovery be stayed until all or part of the RI/FS process has been completed. Instead, DEC assured the court that neither plaintiff's existing wells nor the installation of three additional wells would interfere with the RI/FS.[9] (Tr. at 68, 78.) When the responsible state agency chooses not to ask the court to suspend its proceedings while the agency's work is underway, the court is hard pressed to say that this litigation will "interfere unduly with specialized, ongoing state regulatory schemes," or "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial concern." *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1308 (2d Cir.1990). Thus, the court finds that the completion of Phase 1 discovery, and in particular the installation of three additional monitoring wells, would have an inconsequential effect on "the processes of State government" and would not "undermine the State's ability to maintain desired uniformity." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).[10] Accordingly, *Burford* abstention is inappropriate in this case.[11]

## B. *THE COURT'S INHERENT AUTHORITY TO ISSUE A STAY*

Movants also urge the court to exercise its inherent authority to control its own docket and stay this action until the RI/FS is completed. However, a lengthy stay at this time, whether on abstention or case management grounds, would subordinate plaintiff's citizen's suit to the progress of an administrative proceeding in which plaintiff has no role and whose primary focus is the Quanta site. This is precisely the kind of "end run" around RCRA against which *Sherwin–Williams* warned. To refuse to abstain out of deference to Congressional intent on the one hand, but then to grant the exact same relief as a case management tool on the other, strikes this court as a sleight-of-hand that would just as surely defeat Congress's purpose in authorizing citizen's suits.[12] Moreover, to

9. As explained above, DEC told the court that it will likely incorporate the data obtained from plaintiff's existing ground wells into the proposed work plan and that it "[does not] think that any extra wells that [plaintiff] will install will hurt our investigation in any way." (Tr. at 78.).

10. In addition, as the Second Circuit noted in *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d at 1308, "the presence of a federal basis for jurisdiction may raise the level of justification needed for abstention." (citations and internal quotations omitted). Here, federal claims predominate, including causes of action arising under federal legislation setting environmental national policy on the cleanup of toxic waste.

11. In addition, even if abstention were appropriate as to Quanta and the Generator defendants, the RI/FS will not address plaintiff's claims against Darling, which stem from allegations that Darling released chemical solvents on the Capasso Property. As DEC is investigating only contamination resulting from the release of hazardous materials at the Quanta site, there is thus no basis under *Burford* for this court to decline jurisdiction of the claims against Darling. (Complaint ¶¶ 87, 88.) Thus, any abstention order would of necessity exclude Darling.

12. This does not mean that a stay of a RCRA citizen's suit is never appropriate, but that stays are disfavored and should be entered only where the facts are especially compel-

the extent the stay request is an attempt to reargue the court's prior decision to allow the installation of three additional monitoring wells, the time to do so has long passed.

At oral argument, movants agreed to use their best efforts to develop a DEC-approved work plan that includes sampling in the general areas designated for the three wells plaintiff wishes to install. (Tr. at 128.) If this comes to pass, many of movants' concerns will be mooted, as they will have the opportunity to conduct their own sampling under the auspices of DEC. If not, movants may apply to the court for relief in the event the sampling it wishes to conduct conflicts with a DEC order. The court will then attempt to fashion an appropriate remedy with the participation of DEC.

## II. MOTION TO MODIFY THE CASE MANAGEMENT ORDER

On June 14, 2000, this court adopted the Case Management Order, following extensive discussion among the court and the parties. The Order, which was entered over DMJ's objections, provides for the orderly staging of discovery in three phases. As explained earlier, Phase 1 explores whether there is contamination and endangerment at the Capasso Property, Phase 2 examines who or what caused it, and Phase 3 seeks to develop a remedy. The goal is to limit the unnecessary expendi-

ture of time and resources by first establishing the existence of contamination and endangerment, if any, and then linking the contaminants to the responsible parties. As noted in the Order, the parties anticipated that Phase 1 would last four months. (Case Management Order ¶ 1A(1)). Paragraph IX of the Order allows any party to move to modify the Order upon a showing of "good cause for such modification." (*Id.* at ¶ IX B) [13]

Plaintiff now wishes to modify the Order to permit Phase 2 document discovery.[14] Although Phase 1 has not concluded, plaintiff alleges there is good cause to modify the Case Management Order because (1) many of the documents they seek are old, and with the passage of time it will become increasingly difficult to locate them and contact related witnesses; (2) the documents are necessary for 30(b)(6) depositions under Phase 1, and without them plaintiff would be forced to re-depose many of the same witnesses during Phase 2 of discovery; (3) the documents will help identify the sources of toxic materials found on the Capasso Property and determine who is responsible for their presence; and (4) the litigation is five years-old and should not be delayed further.

Defendants argue that it would be burdensome and expensive to require them to locate, and in some cases reconstruct, old documents before plaintiff has even established that there is contamination and, in

ling. Here, some of movants' concerns are speculative and, even if realized, may be tempered or avoided by actions less drastic than a stay. Should problems arise, the court will address them on a case-by-case basis.

13. Paragraph IX also provides that the motion to modify the Case Management Order be made at least twenty days before the status conference scheduled for September 14, 2000. However, the court construes this provision as an inartfully drafted notice requirement rather than a bar on any modifications

after August 24, 2000, particularly in light of the unanticipated length of Phase 1 discovery, which is still uncompleted after nearly two years.

14. Specifically, plaintiff seeks (1) "for Generators, any documents which demonstrate the waste that they have sent to [facilities at the Quanta site]" and (2) "for owner/operators, any documents relating to their operations at the site that may have caused a release of hazardous substances." (Tr. at 131.)

the case of the RCRA claims, endangerment on the Capasso Property. They note that even DEC has not made such a determination. Defendants hope to file summary judgment motions at the close of Phase 1 discovery that would extricate them from this lawsuit and urge that it would be unfair to force them to expend resources in locating documents which might ultimately prove unnecessary if the claims against them are dismissed. DMJ counters that there is already sufficient evidence of contamination to warrant at least an exchange of documents and that its rights are being prejudiced by the slow pace of this lawsuit.

 In a perfect world, discovery would proceed swiftly according to a well-ordered progression of issues. However, as Phase 1 discovery grinds into its third year, the court finds that circumstances have changed and there is good cause to begin the discovery of Phase 2 documents [15]. The court is persuaded by plaintiff's arguments that, with the passage of time, it may become increasingly difficult to locate documents and witnesses, and that provision of these documents may increase the efficiency of the discovery process [16]. It is one thing to delay Phase 2 document pro-

duction four months, as the Order initially contemplated, and another to defer it two to three years—and perhaps longer with anticipated motion practice. The court is mindful of the burdens of document production, but finds that the potential benefits of preventing the loss of documents and witnesses and expediting the progress of this litigation, in keeping with the spirit underlying Congress's authorization of citizen's suits, outweighs those burdens.[17] Accordingly, DMJ's motion to modify the Case Management Order is granted for the limited purpose of conducting Phase 2 document discovery as discussed at oral argument.

## CONCLUSION

For the reasons set forth above, the motion for a stay is denied and the motion to modify the Case Management Order is granted.

SO ORDERED.

---

**15.** The court disagrees with defendants' assertion that DMJ has dragged its heels in this contentious litigation, and sfinds that the delays in installing plaintiff's three additional monitoring wells were caused in large part by the opposition of non-party Prince Plastic and complicated by the events of September 11, 2001.

**16.** In addition to plaintiff's assertion that witnesses will have to be deposed twice if the documents are not available, plaintiff has also presented some evidence that knowledge of the types of operations conducted at the various sites and their location would help guide discovery efforts. (*See* Declaration of William Dunnell, dated March 11, 2002, in support of Plaintiff's motion to modify the Case Management Order.)

**17.** While accepting defendants' representation that producing Phase 2 documents would be burdensome, the court is unable to assess the extent of the burden, which defendants maintained during oral argument was heavy. In a letter to the court after oral argument, defendants offered to produce Phase 2 document discovery if the court stayed the litigation as movants had requested. Defendants emphasized that this offer was made to remove an obstacle to the stay and was not available if the stay request was denied. (Letter to Honorable Robert M. Levy from Norman W. Bernstein, Esq., dated March 22, 2002.) As the stay was not granted, the court will assume that the agreement to modify the Case Management Order is withdrawn.