**In re: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION**

This document relates to: United Water New York, Inc. v. Amerada Hess Corp., et al., 04–Civ–2389

Suffolk County & Suffolk County Water Authority v. Amerada Hess Corp., et al., 04–Civ–5424

City of New York v. Amerada Hess Corp., et al., 04–Civ–3417

No. 1:00 1898.
No. MDL 1358(SAS).
No. M 21–88.

United States District Court,
S.D. New York.

Jan. 8, 2007.

Robin Greenwald, Robert Gordon, C. Sanders McNew, Weitz & Luxenberg, P.C., New York, NY, for Plaintiffs.

Daniel Greene, Assistant Corporation Counsel, Environmental Law Division, New York City Law Department, New York, NY, for the City of New York.

Peter John Sacripanti, James A. Pardo, Stephen J. Riccardulli, McDermott, Will & Emery LLP, New York, NY, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

■ In this consolidated multi-district litigation, New York water providers ("plaintiffs") have sued various defendants for the contamination, or threatened contamination, of many of plaintiffs' wells as a result of defendants' use of the gasoline additive methyl tertiary butyl ether ("MTBE").[1] Defendants now move to either stay or dismiss plaintiffs' claims for equitable relief based on the doctrine of "primary jurisdiction."[2] Under this judi-

---

1. The plaintiffs, Suffolk County Water Authority and the County of Suffolk (together, "SCWA"), United Water of New York ("UWNY"), and the City of New York (the "City"), each own and operate wells that they claim have been, or are imminently threatened with, MTBE contamination. For a thorough recitation of plaintiffs' fact allegations

see, for example, *In re MTBE Prods. Liab. Litig.*, 379 F.Supp.2d 348, 364–67 (S.D.N.Y. 2005).

2. *See* Defendants' Motion to Dismiss or Stay Plaintiffs' Claims for Injunctive and Declaratory Relief Based on the Doctrine of Primary Jurisdiction ("Def.Mem.") at 1. Defendants'

cially created doctrine, courts have the discretion to stay or dismiss a claim out of deference to state or federal agencies that have expertise in resolving issues that are material to litigation brought before the court.[3]

In this case, defendants contend that the requested remedial relief is already being provided by the New York State Department of Environmental Conservation (the "DEC") and related entities that comprise New York's complex environmental regulatory system.[4] Thus, defendants maintain that any relief ordered by this Court will be unnecessarily duplicative and also risk interference with these ongoing remedial efforts.

## II. THE DOCTRINE OF PRIMARY JURISDICTION

■ Under the doctrine of primary jurisdiction, when certain issues or forms of requested relief require the resolution of matters that fall "beyond the conventional experience of judges" or are "within the realm of ... an administrative agency with more specialized experience, expertise, and insight [than the judiciary]," a court may either stay the action until the agency has considered the issue, or may dismiss the claims altogether.[5] This judicially created doctrine serves two primary interests. *First,* it allows the resolution of "technical questions of fact through an agency's specialized expertise prior to judicial consideration of the legal claims." *Second,* such deference ensures "consistency and uniformity in the regulation of an area" entrusted to an agency by the legislature through a regulatory scheme.[6]

■ In short, a court's deference to an agency guarantees that "courts and agencies with concurrent jurisdiction over a matter do not work at cross-purposes."[7] Courts apply this doctrine in the "narrow scope"[8] of circumstances where " 'enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.' "[9]

■ While the doctrine is not governed by any "fixed rules or formulas for its application,"[10] the following four factors have provided guidance for the courts:

motion is only addressed to plaintiffs' claims for equitable relief, and does not seek to stay or dismiss plaintiffs' claims for compensatory or punitive damages.

**3.** *See, e.g., Far East Conf. v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952).

**4.** *See* Def. Mem. at 1.

**5.** *United States v. Gabelli,* 345 F.Supp.2d 340, 350–51 (S.D.N.Y.2004).

**6.** *In re MTBE Prods. Liab. Litig.,* 175 F.Supp.2d 593, 616 (S.D.N.Y.2001) (*"MTBE I"*).

**7.** *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.,* 84 F.3d 91, 97 (2d Cir. 1996). While the doctrine was originally articulated to allocate initial decision-making authority between federal courts and federal agencies, its principles have been extended to the relationship between federal courts and state agencies. *See Johnson v. Nyack Hosp.,* 964 F.2d 116, 122–23 (2d Cir.1992). Likewise, New York's state courts apply the same doctrine to determine whether to defer to state agencies. *See, e.g., Flacke v. Onondaga Landfill Sys., Inc.,* 69 N.Y.2d 355, 362–63, 514 N.Y.S.2d 689, 507 N.E.2d 282 (1987) (discussing the doctrine).

**8.** *Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 851 (2d Cir.1988).

**9.** *MTBE I,* 175 F.Supp.2d at 616 (quoting *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).

**10.** *Tassy v. Brunswick Hosp. Center, Inc.,* 296 F.3d 65, 68 (2d Cir.2002) (citing *Western Pac. R.R.,* 352 U.S. at 64, 77 S.Ct. 161).

(1) whether the question is particularly within the agency's discretion;

(2) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether prior application to the agency has been made.[11]

Additionally, courts frequently " 'balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in administrative proceedings.' "[12] Finally, whether to stay or dismiss a claim in favor of a concurrent administrative proceeding is always " 'within the sound discretion of the court.' "[13]

## III. NATURE OF PLAINTIFFS' REQUESTED RELIEF

Whether this Court should stay or dismiss plaintiffs' claims under the doctrine of primary jurisdiction depends on the nature of the relief sought by plaintiffs because only by analyzing the type of relief sought can the court determine whether the "purposes [the doctrine] serves will be aided by its application to [this] particular litigation."[14]

In addition to compensatory and punitive damages, plaintiffs have requested a broad array of injunctive and equitable remedies. For example, the City requests that the Court order "all appropriate relief to abate and/or mitigate, among other things, the contamination by MTBE and [its byproducts],"[15] including the "installation of remediation technologies on all City wells"[16] which are currently drawing upon MTBE-contaminated groundwater, and the "undertaking of prophylactic measures designed to abate the imminent harm that [MTBE and its byproducts] pose" to the City's other wells.[17] As is apparent from the City's request, the nature of the injunctive and equitable relief sought may be roughly divided between (1) requests for remediation or treatment of the alleged contamination, and (2) protective measures designed to prevent further contamination. The specific types of relief in the remedial category include:

1. relief through "well head treatment";

2. abatement of "the continuing nuisance by removing" soil and groundwater contamination; and

3. the provision of "alternative water."[18]

---

**11.** *MTBE I*, 175 F.Supp.2d at 617 (citing *National Comm. Assoc. v. American Tel. & Tel. Co.*, 46 F.3d 220, 222–23 (2d Cir.1995)).

**12.** *Id.* (quoting *National Comm. Assoc.*, 46 F.3d at 223).

**13.** *Gabelli*, 345 F.Supp.2d at 351 n. 45 (quoting *Syntek Semiconductor Co. v. Microchip Tech., Inc.*, 307 F.3d 775, 781 (9th Cir.2002)).

**14.** *Tassy*, 296 F.3d at 68. This may be particularly true where the relief sought is injunctive or equitable, as there may be greater overlap between the court-ordered relief and any administrative proceedings. *See Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F.Supp. 1333, 1350 (D.N.M.1995) (the doctrine is more "readily applicable" to requests for injunctive relief).

**15.** The City's Second Amended Complaint ¶ 5.

**16.** *Id.* ¶ 185(3).

**17.** *Id.* The City also requests all "appropriate declaratory relief." *Id.* ¶ 185(4).

**18.** SCWA's Fourth Amended Complaint ("SCWA Compl."), Prayer for Relief ¶ 1(iii), (iv), (viii); UWNY's Second Amended Complaint ("UWNY Compl."), Prayer for Relief ¶ 1(iii), (iv), (viii). The Complaints also include broad requests for "all further measures necessary." *See, e.g.,* UWNY Compl., Prayer for Relief ¶ 1(ix).

Each of these requested actions aims to alleviate problems resulting from present contamination. By contrast, the specific types of relief in the preventive category aim to protect or limit plaintiffs' wells from further contamination:

1. requests for "investigation," and "testing and monitoring";

2. the establishment of an "early warning system to detect MTBE before it reaches a well";

3. a "well head protection program"; and

4. an order "preventing defendants from engaging in further releases of MTBE." [19]

While these requests are broadly framed in the Complaints, subsequent briefing has made it clear that plaintiffs "do not seek remediation of spills." [20] Rather, plaintiffs limit their requests to "remediation of contamination in their wells," as well as the "provision of mechanisms to protect against future MTBE intrusions [to their wells]." [21]

Further, at oral argument on this motion, plaintiffs agreed that at least some of the remediation/treatment measures they seek do not require the exercise of this Court's equitable powers. [22] For example, plaintiffs' request for the installation of treatment systems at their wells—*i.e.,* "remediation of contamination in their wells" and "well head treatment"—essen-

tially seeks damages for current and future treatment costs resulting from past contamination. [23] These claims are indistinguishable from plaintiffs' compensatory damages claim to the extent that plaintiffs are compelled to expend funds in order to treat or remediate MTBE contamination at their wells.

## IV. THE PRIMARY JURISDICTION FACTORS DO NOT FAVOR STAYING OR DISMISSING PLAINTIFFS' CLAIMS

■ As explained below, staying or dismissing plaintiffs' claims is not warranted here because none of the four factors weigh heavily in favor of deference to the state agencies of New York. Moreover, there are no significant advantages to be gained by waiting for the conclusion of an informal administrative process that may not offer plaintiffs the relief they seek.

### A. The Questions Raised Are Not Particularly Within the DEC's Discretion

New York has a complex regulatory system tasked with investigating and overseeing responses to specific instances of environmental contamination. Under New York's Oil Spill Prevention, Control, and Compensation Act (the "Navigation Law"), the DEC is charged as the primary agency responsible for responding to petroleum releases and resulting environmental contamination. [24] Working in conjunction with

---

**19.** SCWA Compl., Prayer for Relief ¶ 1(i), (ii), (v)-(vii); UWNY Compl., Prayer for Relief ¶ 1(i), (ii), (v)-(vii).

**20.** Plaintiffs' Memorandum in Opposition to Defendants' Motion on Primary Jurisdiction ("Pl.Mem.") at 2.

**21.** *Id.*

**22.** *See* 10/11/06 Transcript of Oral Argument ("Tr.") at 81 (conceding that "the appropriate relief [for treatment at plaintiffs' wells] ... is primarily a money damages relief").

**23.** *See* Defendants' Reply Memorandum at 5–7 (arguing that the appropriate remedy is a claim at law for monetary relief, rather than an injunctive order which would be aimed at preventing *future contamination* ).

**24.** *See* N.Y. Nav. Law art. 12 § 171 (stating that the purpose of the legislation is to "ensure a clean environment and healthy economy for the state by preventing the unregulated discharge of petroleum which may result in damage to lands, waters or natural resources of the state by authorizing the department of environmental conservation to respond quick-

a host of other regulatory agencies on the federal and state level, as well as various concerned parties, the DEC coordinates abatement and remediation of environmental contamination.

Nevertheless, the DEC, together with related agencies, do not establish such a comprehensive framework that this Court should stay or dismiss plaintiffs' claims because the relief ordered by the Court, if any, will not displace New York's regulatory apparatus. Indeed, when courts have deferred to agency expertise in remediation of environmental contamination, they have done so largely because the specific

relief sought was—in some form—already being provided through the administrative process.[25]

■ But, where there is "ample room for injunctive relief beyond [the DEC's] efforts," a court need not defer to the administrative process.[26] Here, the DEC's remedial measures may not go far enough and there remains "ample room" for this Court's involvement.[27] While the DEC plays a significant role in crafting an overall response to a petroleum release and the resulting contamination,[28] the DEC's activities are largely focused on abatement and

ly to such discharges and effect prompt clean-up and removal of such discharges").

**25.** *See, e.g., Collins v. Olin Corp.,* 418 F.Supp.2d 34, 46 (D.Conn.2006) ("This Court is convinced . . . that the terms of the Consent Order [requiring investigation and remediation by various defendants] sufficiently establish that the plaintiffs' concerns in this case are being addressed by the [Connecticut Department of Environmental Protection].").

**26.** *Lambrinos v. Exxon Mobil Corp.,* No. 00–Civ–1734, 2004 WL 2202760, at *6 (N.D.N.Y. Sept.29, 2004) (holding that deference to the DEC in a case involving groundwater contamination from leaking underground storage tanks was inappropriate because the agency had not directed "remediat[ion] to the extent necessary to make the issue of injunctive relief moot"). *Accord DMJ Assocs. v. Capasso,* 228 F.Supp.2d 223, 228–30 (E.D.N.Y.2002) (declining to defer consideration of plaintiff's requested relief, which included the installation of monitoring wells, despite ongoing DEC investigation and proposed consent order); *87th Street Owners Corp. v. Carnegie Hill–87th Street Corp.,* 251 F.Supp.2d 1215, 1219–20 (S.D.N.Y.2002) (deference to DEC not required where "defendant could be ordered to take [some action] that is not already in place" as a result of agency efforts, and that action "would improve the situation in some way"); *Martin v. Shell Oil Co.,* 198 F.R.D. 580, 587 (D.Conn.2000) (plaintiff's claims relating to remediation of its own property would not interfere with agency regulation at the release site); *see also Plainview Water Dist. v. Exxon Mobil Corp. et al.,* No.

009975–01, slip op. at 16 (Sup.Ct. Nassau Co. Nov. 27, 2006) ("While [plaintiff's request for abatement of MTBE plume] . . . is vague in its precise import, it by no means follows that fashioning a remedy based thereon will impact or interfere with on-site, DEC remediation efforts or . . . impinge upon the DEC's opportunity to address a relevant issue that is within the area of its expertise.").

**27.** *See* Tr. at 99 ("[Plaintiffs] do not argue that the DEC has no role. . . . [But] the kinds of equitable relief that we seek is not the kind of relief that the DEC ordered on this record or has any realistic possibility of ordering in the future.") (Lemuel Srolovic, counsel to SCWA and UWNY). In this regard, plaintiffs' opposition papers focused on the fact that the DEC does not generally take action at the plaintiffs' wells. *See* Pl. Mem. at 11 ("[I]n a bare handful of instances, [the] DEC has taken steps to assist in the remediation of gasoline spills near plaintiffs' wells. But plaintiffs now seek equitable relief from defendants for the treatment and protection of their contaminated wells, not the [groundwater] resource from which the wells draw."). As discussed above, plaintiffs' claims for *treatment* of their wells are properly ones for money damages, not equitable relief. By contrast, plaintiffs' claims for *protection* of their wells may be an appropriate area for the exercise of this Court's equitable powers.

**28.** Most importantly, the DEC coordinates the activities of the various actors, including the responsible parties, various state agencies, and the plaintiffs.

remediation at the spill source or surrounding areas—rather than remediation of plaintiffs' wells or protecting those wells from future contamination.

The City's well 6D is a good example of the roles played by various parties in response to contamination. Well 6D, along with the other wells comprising Station 6 in Queens, was originally drilled in the 1930s and 1940s and was taken offline by 1985.[29] In 1999, the City and its Environmental Engineer, Malcolm Pirnie, determined to upgrade the facilities of Station 6 and reactivate the wells.[30]

During the upgrade of the well, MTBE, along with other contaminants, was detected in the well.[31] The City promptly informed the DEC about the detections and, from a review of DEC spill records, possible sources of the contamination.[32] The DEC then "[took] over responsibility for investigating [MTBE] contamination near Station 6."[33] In particular, the DEC requested investigation at two stations at which spills had been reported to determine whether they were the source of the

contamination.[34] To this day, the source of the contamination has not been identified and no remediation has been conducted.[35]

Thus, as plaintiffs argue, the DEC's role has been largely limited to the unsuccessful search for the source of the contamination.[36] Further, even if the source was found, the City—not the DEC—would remain responsible for implementing any necessary treatment or remediation of well 6D and its other wells.[37] Thus, there is "ample room"—at least, at the plaintiffs' wells—for this Court to order injunctive or equitable relief without displacing the DEC's role in spill site remediation.

**B. The Questions Raised Are Not Outside the Conventional Experience of This Court**

■ Much of the relief plaintiffs are seeking—such as the installation of sentinel or recovery wells—does not require this Court to engage in a level of detailed technical and policy analysis for which it is not particularly well-suited. While remediation at the spill site may be best left to the expertise of the DEC and its sister agencies,[38] this fact need not concern the

**29.** *See* Malcolm Pirnie, Pilot Testing Memorandum No. 1: Station 6 Inlet Water Quality and Design Criteria (August 2003) ("Pilot Mem."), Ex. 1 to Declaration of P. Renée Wicklund in Support of Defendants' Primary Jurisdiction Motion ("Wicklund Decl."), at 2.

**30.** *See* Declaration of William Yulinsky in Support of Plaintiffs' Opposition to Defendants' Primary Jurisdiction Motion ("Yulinsky Decl.") ¶ 4.

**31.** *See id.* ¶ 6.

**32.** *See id.*

**33.** 5/5/05 Meeting Minutes, Citizens Advisory Committee on the Brooklyn–Queens Aquifer Feasibility Study, Ex. 2 to Wicklund Decl., at 2.

**34.** *See id; see also* Yulinsky Decl. ¶ 7. At a third station where releases had been reported, the DEC entered into a Stipulation Agreement to facilitate remediation at the spill site. *See* Pilot Mem. at 4. Subsequent monitoring

indicated the resulting plume was "not extending toward Station 6 wells." *Id.*

**35.** *See* Yulinsky Decl. ¶ 7 ("Well 6D is one of many wells in the City's groundwater system where neither [the DEC], nor any other regulatory agency for that matter, has been able to locate a source for the MTBE contamination, and therefore has not ordered any formal remediation of the offending plume.").

**36.** *See* Pl. Mem. at 9.

**37.** *See* Yulinsky Decl. ¶ 8. The record as to other wells is not substantially different. Remediation efforts were largely coordinated by the DEC, and the DEC would implement specific measures at the spill site and surrounding areas, but not at plaintiffs' wells.

**38.** *See generally* Declaration of Charles McLane III, defendants' environmental consultant, in Support of Defendants' Motion on Primary Jurisdiction ("McLane Decl."). De-

Court because plaintiffs are not seeking remediation of spill sites.[39] In the case of well 6D, for example, if the contaminant source were eventually identified, any remediation would remain under the auspices of the DEC which has the expertise to engage in this complex task. By contrast, an order relating to the provision of protective mechanisms—which might include such categories of relief as "investigation," "testing and monitoring," or an "early warning system" of sentinel wells—requires substantially less expertise than remediation, and could be appropriately fashioned by this Court.[40]

## C. The Relief Requested Does Not Pose a Substantial Danger of Inconsistent Results

 It is also unlikely that any of the relief that this Court might eventually order would interfere with ongoing DEC proceedings or lead to the type of inconsistencies that the primary jurisdiction doctrine seeks to prevent. As discussed, the DEC oversees remediation at spill sites rather than at plaintiffs' wells, and it is unlikely that court-ordered measures at plaintiffs' wells would work at "cross-purposes" with the DEC. Further, while the DEC does frequently order the installation of monitoring wells, defendants have failed to show how an order of such protective measures by this Court would interfere with the DEC's primary obligations.[41]

Of course, there may be some specific instances where a court-ordered remedial measure might *conceivably* conflict with the DEC's overall remediation goals.[42] Nevertheless, the mere possibility of inconsistency is not sufficiently grave a concern to warrant deferral, as application of the primary jurisdiction doctrine is warranted only when the requested relief "create[s] a substantial danger of inconsistency." [43]

## D. Prior Application to the DEC

 Finally, prior application by these plaintiffs to the DEC does not weigh heavily either in favor of or against deferral. Some of the relief sought here might be available from the DEC, while other relief might not be.[44] Nevertheless, the

---

fendants' expert suggests that determining the appropriate means of remediation requires the coordination of diverse expertise for which the DEC is uniquely suited. *See id.* ¶¶ 6–8. Further, defendants' expert cautions that remediation "not coordinated, overseen and directed by [the DEC] would be ineffective and likely would risk causing significant environmental harm...." *Id.* ¶ 5.

39. *See* Pl. Mem. at 2 ("Plaintiffs do not seek remediation of spills.").

40. *See, e.g., DMJ Assocs.,* 228 F.Supp.2d 223 (court ordered monitoring wells to determine spread of contamination plume).

41. In a similar context, for example, a district court has ordered the installation of monitoring wells at the same time that the DEC was conducting an investigation into nearby contamination. Although the DEC did not believe that the new wells would be necessary, the court allowed the installation because "DEC expressly stated that neither the continuation of the existing monitoring wells nor the installation of plaintiff's three additional wells would interfere with its investigation." *See id.* at 227.

42. For example, depending on the delineation of a particular plume of contamination and the subsurface hydrogeology, the installation of a recovery well or other measures which might "chang[e] the overall movement and direction of groundwater flow" could exacerbate the threat posed by the contamination or interfere with other remedial systems. McLane Decl. ¶ 13. As an example, defendants note that in the case of Sparkill No. 8, the DEC "concluded that wellhead treatment might pull contamination further into the well field" and therefore suggested off-site remediation instead. Def. Mem. at 22 n. 27.

43. *MTBE I,* 175 F.Supp.2d at 617.

44. Indeed there may be certain types of relief that the DEC is incapable of giving—for example, this Court has ordered certain defen-

fact that such relief might be sought through administrative channels does not preclude this Court from providing similar relief.

These cases also present circumstances that are different than the typical court-agency dichotomy that the primary jurisdiction doctrine generally addresses. The primary jurisdiction doctrine is in many ways analogous to the requirement of exhaustion of administrative remedies—under both doctrines courts will defer the exercise of their jurisdiction until the administrative process has run its course.[45] Here, however, there is no formal procedure for plaintiffs to petition the DEC, and while there is no doubt that plaintiffs and the DEC work in close coordination, the DEC, in determining whether to order certain remedial measures, is not adjudicating plaintiffs' rights.[46]

## IV. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss or stay plaintiffs' claims for injunctive, equitable, and declaratory relief based on the doctrine of primary jurisdiction is denied. Ultimately, this Court has broad authority in fashioning injunctive and equitable remedies.[47] While rejecting defendants' argument that this Court should decline to exercise its jurisdiction here, any injunctive or equitable relief which might eventually issue from this Court will surely take into account the need for consistency and coordination with the actions of the involved state agencies. The Clerk of the Court is directed to close this motion (Docket No. 875).

SO ORDERED.

---

dants to produce information which plaintiffs believe will prevent imminent contamination of their wells. *See* 10/25/06 Case Management Order No. 21 ¶ 2. It is exactly this type of "necessary relief" which this Court, rather than any agency, is best suited to provide.

45. *See Western Pac. R.R.*, 352 U.S. at 64, 77 S.Ct. 161.

46. *See Martin*, 198 F.R.D. at 587 n. 9 ("[P]laintiffs are concerned with remediation of *their own* real property, and not merely to a degree that the [Connecticut Department of Environmental Protection] determines to be acceptable to the public.").

47. *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 716 (2d Cir.2004) (citing *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973)).