361 F.3d 696
 Sajida BANO, Haseena BI, Sunil Kumar, Dr. Stanley Norton, Asad Khan, Shiv Narayan Maithil, Devendra Kumar Yadav, Bhopal Gas Peedit Mahila Udyog Sangathan (BGPMUS), Gas Peedit Nirashrit Pension Bhogi Sangharsh Morcha (GPNPBSM), Bhopal Gas Peedit Mahila Stationery Karmachari Sangh (BGPMSKS), Bhopal Gas Peedit Sangharsh Sahayog Samiti (BGPSSS), and Bhopal Group for Information and Action (BGIA), on behalf of themselves and all others similarly situated, Plaintiffs,
Haseena BI, Bhopal Gas Peedit Mahila Udyog Sangathan (BGPMUS), Bhopal Gas Peedit Mahila Stationery Karmachari Sangh (BGPMSKS), Bhopal Gas
Peedit Sangharsh Sahayog Samiti (BGPSSS), and Bhopal Group for Information and Action (BGIA), on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
UNION CARBIDE CORPORATION and Warren Anderson, Defendants-Appellees.
 No. 03-7416.
 United States Court of Appeals, Second Circuit.
 Argued: October 30, 2003.
 Decided: March 17, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Curtis V. Trinko, New York, NY (Curtis V. Trinko, LLP, New York, New York, H. Rajan Sharma, Edison, NJ, Richard L. Herz, Earthrights International, Washington, D.C., on the brief), for Plaintiffs-Appellants.
 William A. Krohley, New York, NY (William C. Heck, Kelley Drye & Warren, New York, NY, on the brief), for Defendants-Appellees.
 Members of the United States House of Representatives Frank Pallone, Jr., Raul M. Grijalva, Sherrod Brown, Eni F.H. Faleomavaega, Janice D. Schakowsky, Dennis J. Kucinich, Sheila Jackson-Lee, Joseph Crowley, and Fortney Pete Stark, Washington, D.C., filed a brief as Amici Curiae in support of Appellants.
 Before: FEINBERG, KEARSE, and RAGGI, Circuit Judges.
 KEARSE, Circuit Judge.
 
 
 1
 Plaintiffs Haseena Bi and several organizations representing residents of Bhopal, India, to wit, Bhopal Gas Peedit Mahila Udyog Sangathan ("BGPMUS"), Bhopal Gas Peedit Mahila Stationery Karmachari Sangh ("BGPMSKS"), Bhopal Gas Peedit Sangharsh Sahayog Samiti ("BGPSSS"), and Bhopal Group for Information and Action ("BGIA") (collectively the "Bhopal organizations"), appeal from a judgment of the United States District Court for the Southern District of New York, John F. Keenan, Judge, dismissing their amended complaint seeking monetary and equitable relief for personal injuries and property damage allegedly suffered by Bi and persons similarly situated as a result of exposure to water contaminated by chemicals released from a factory site operated in Bhopal in 1969-1984 by a subsidiary of defendant Union Carbide Corp. ("Union Carbide"). The district court granted defendants' motion to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6) and/or 56, ruling (1) that Bi's damages claims for personal injury and property damage are barred by the statutes of limitations set forth in New York Civil Practice Law and Rules ("N.Y.C.P.L.R." or "CPLR") §§ 214 and 214-c (McKinney 2003), (2) that the Bhopal organizations lack standing to bring claims for money damages on behalf of their members, and (3) that the injunctive relief demanded in the amended complaint is not feasible. On appeal, plaintiffs contend (a) that the district court's statute-of-limitations ruling was erroneous because Bi's personal injury claims are timely under, inter alia, a continuing trespass theory or a continuing nuisance theory, and because defendants failed to carry their burden of showing when Bi's property damage claims accrued; (b) that the court's ruling on standing was erroneous because the Bhopal organizations should be allowed to pursue damages claims as putative class representatives; and (c) that the court's conclusion as to the impracticability of the requested equitable relief was unsubstantiated. For the reasons that follow, we affirm the judgment of the district court except to the extent that it dismissed Bi's claims for monetary and injunctive relief for alleged injury to her property. As to those claims, we vacate the judgment and remand for further proceedings, including consideration of whether those claims may be pursued in a class action.
 
 I. BACKGROUND
 
 2
 In 1984, a highly toxic gas, methyl isocyanate, was released into the air from a chemical manufacturing facility in Bhopal operated by Union Carbide India Limited ("UCIL"), an Indian company that was 50.9%-owned by Union Carbide, killing thousands of people and injuring more than 200,000 others (the "gas-release disaster"). See generally In re Union Carbide Corp. Gas Plant Disaster, 809 F.2d 195, 197 (2d Cir.), cert. denied, 484 U.S. 871, 108 S.Ct. 199 (1987). The present lawsuit is one of many commenced after that disaster. See Bano v. Union Carbide Corp., 273 F.3d 120, 122-24 (2d Cir.2001) ("Bano I"). In Bano I, we affirmed the dismissal of so much of the present complaint as asserted claims for injuries arising out of the gas-release disaster, ruling that those claims were barred by a settlement between Union Carbide and the government of India that had been approved by the Supreme Court of India. See id. at 122; see also Bi v. Union Carbide Chemicals & Plastics Co., 984 F.2d 582, 586 (2d Cir.) (affirming ruling that individual victims lack standing to challenge the settlement negotiated between Union Carbide and India), cert. denied, 510 U.S. 862, 114 S.Ct. 179, 126 L.Ed.2d 138 (1993). We noted in Bano I, however, that the district court had dismissed without discussion the common-law claims for environmental injuries unrelated to the gas-release disaster, and we remanded for further proceedings on those claims. See 273 F.3d at 132-33.
 
 
 3
 A. UCIL's Plant Operations and Storage of Toxic Wastes
 
 
 4
 The portion of the amended complaint whose dismissal was vacated in Bano I alleged principally that residents of and near Bhopal suffered physical injury and property damage caused by pollution that emanated from the site of UCIL's operations in Bhopal and entered the residents' water supply. For purposes of the present appeal from the district court's grant of summary judgment and its decision that the Bhopal organizations lacked standing as a matter of law, we view the record in the light most favorable to plaintiffs as the parties against whom summary judgment was granted.
 
 
 5
 UCIL's Bhopal plant commenced operation in 1969 on two noncontiguous tracts of land, totaling 88 acres, leased at various times from the Indian State of Madhya Pradesh. At the plant, pesticides imported from a Union Carbide facility in West Virginia were converted into a marketable product for sale in India. In 1979 or 1980, UCIL began to manufacture at its Bhopal plant the pesticides that it previously had been importing. As a byproduct of the expanded operations, hazardous wastes were produced. UCIL kept these wastes in tanks and pits at the plant site, as well as in three solar evaporation ponds constructed on the noncontiguous leased property some 800 meters north of the plant.
 
 
 6
 A UCIL document indicates that in March 1982, UCIL was aware of leakage from one of the evaporation ponds and that another pond showed signs of leakage. In April 1982, a UCIL document noted that "continued leakage from [an] evaporation pond [was] causing great concern" and that repairs were being planned with the assistance of consultants. Immediately following the 1984 gas-release disaster, operations at the UCIL plant were discontinued, and the plant was closed in early 1985. Thereafter, the Indian government took control of the unit responsible for the production of methyl isocyanate. Apparently it is undisputed that the plant never resumed normal operations and that no effluent was added to the solar evaporation ponds after 1984.
 
 
 7
 In 1989, the Madhya Pradesh government asked the National Environmental Engineering Research Institute ("NEERI"), an Indian governmental organization, to conduct a study of the environmental damage caused by the solar evaporation ponds in order to help determine whether the land where those ponds were located was suitable for alternative industrial uses. In April 1990, NEERI issued a report stating that its study found no evidence of certain chemicals that would be indicative of pollution in test wells dug within a one-kilometer radius of the solar evaporation ponds and found that the water quality met local standards in test wells dug within a 10-kilometer radius of the ponds. (See NEERI, Assessment of Pollution Damage Due to Solar Evaporation Ponds at UCIL, Bhopal (1990) ("First NEERI Report" or "First Report") at xiv-xv.) Its
 
 
 8
 [i]nvestigations revealed that the land and water environment have not been contaminated due to the provision of flexible membrane liner in the pond and [the] presence of low permeable plastic clay below [the solar evaporation ponds].
 
 
 9
 (Id. at unnumbered Foreword page.) "The overall conclusion of the study [wa]s that no contamination of soils and ground water was observed due to the impoundment of wastewater in solar evaporation ponds." (Id. at xvii.) However, the First NEERI Report recommended remediation of the waste sites, to wit, excavation of the sediment, residue, and contaminated soil from two of the solar evaporation ponds and their containment in a secure landfill in the third pond. (See id. at xviii.) UCIL thereafter undertook these tasks, but work to close and cap the secure landfill was not completed until July 1998.
 
 
 10
 In the meantime, there were additional environmental studies and a change in UCIL's corporate ownership. In September 1994, Union Carbide sold all of its shares in UCIL, which was subsequently renamed "Eveready Industries India Limited" ("EIIL"). EIIL succeeded to UCIL's lease, which required EIIL to use the land for industrial purposes. EIIL retained NEERI to assess environmental conditions on the plant premises in 1994.
 
 
 11
 In October 1997, NEERI responded with a report entitled Assessment of Contaminated Areas Due to Past Waste Disposal Practices at EIIL, Bhopal (1997) ("Second NEERI Report"). The Second NEERI Report stated that NEERI had found contamination within the former UCIL plant site at the waste disposal areas. (See id. at unnumbered pages 5-7 of Executive Summary.) However, it reaffirmed the First Report's finding of no groundwater contamination in and around the plant site. (See id. at unnumbered page 5 of Executive Summary.) A July 1998 press release by the government of Madhya Pradesh reported that the Madhya Pradesh Pollution Control Board had also collected and analyzed samples from drinking water sources in the areas around the former UCIL premises. (See Government of Madhya Pradesh, Directorate of Public Relations, Safe Disposal of Wastes in Union Carbide Premises: No Contamination of Ground Water or Soil from Wastes (July 28, 1998) at 1.) That study "found no traces of chemicals in the water sources that may be linked to the chemicals used in the Union Carbide factory or the wastes there." (Id.)
 
 
 12
 EIIL made efforts to remediate the plant sites and was to develop a proposal for industrial activity on the property. When it failed to come up with such a proposal, it was eventually required to surrender the land. The State of Madhya Pradesh took control of the land in September 1998.
 
 
 13
 In November 1999, Greenpeace Research Laboratories, Department of Biological Sciences, University of Exeter ("Greenpeace" or "Greenpeace Research Laboratories"), issued a report based on its independent testing of soil and water in Bhopal. (See I. Labunska et al., Greenpeace Research Laboratories, The Bhopal Legacy: Toxic Contaminants at the Former Union Carbide Factory Site, Bhopal, India: 15 Years After the Bhopal Accident (1999) ("Greenpeace Report").) That report recounted findings of "substantial and, in some locations, severe contamination of land and drinking water supplies with heavy metals and persistent organic contaminants both within and surrounding the former UCIL pesticide formulation plant." (Greenpeace Report at 4.) B. Bi's Pollution Claims and the Motion To Dismiss
 
 
 14
 The Bhopal organizations and several other entities who are not parties to this appeal commenced the present action in November 1999; an amended complaint, adding Bi as a plaintiff, was filed in January 2000. The amended complaint added claims alleging, to the extent pertinent to this appeal, that the individual plaintiffs and other similarly situated residents of and near Bhopal suffered physical injury and property damage caused by pollution emanating from the UCIL property and entering the residents' water supply (collectively the "pollution claims"). The amended complaint alleged that the Greenpeace Report "confirm[s] scientifically that massive environmental contamination, including contamination of the drinking water of residents in the nearby communities, entirely unrelated to the Bhopal Disaster, has taken place at the UCIL site where large amounts of toxic chemicals and by-products from the factory's original manufacturing processes continue to pollute the land and water." (Amended Complaint ¶ 95.)
 
 
 15
 According to an affidavit submitted by Bi, Bi has, since 1990, resided in Atal Ayub Nagar, India, a residential community "in the immediate vicinity of the [former] UCIL plant site." (Affidavit of Haseena Bi dated September 26, 2002 ("Bi Aff."), ¶ 4.) "Within a few weeks" of moving to Atal Ayub Nagar, Bi and her family began to experience health problems, which included skin rashes, severe nausea, and headaches, and which, over time, worsened into severe abdominal pain and bleeding rashes. (Id. ¶¶ 5, 6.) Bi's family members ultimately attributed their health problems to "water taken from the handpump water well near where [Bi] live[s]" (id. ¶ 6), which they used for drinking, cooking, bathing, and cleaning. According to Bi, "[a]ll of the handpump wells in the nearby residential areas ... seem to be contaminated because the water has the same strong noxious smell of chemicals with an oily layer on top, and others using those wells have complained to [Bi] of similar symptoms." (Id. ¶ 8.) Because she has no access to an alternative water supply, Bi continues to be exposed to the contaminated water. (See id. ¶¶ 7, 9; Amended Complaint ¶ 8.)
 
 
 16
 The Bhopal organizations were described in the amended complaint principally as grass-roots, self-help, or advocacy organizations whose members were victims, or survivors of victims, of the gas-release disaster. (See Amended Complaint ¶¶ 28, 30-32.) The amended complaint alleged that the "vast majority of members" of BGPMUS and BGPMSKS continue to reside in residential colonies surrounding the former UCIL plant site and "continue to be exposed to pesticides, toxic chemicals and other by-products which have contaminated the soil and water near the facility." (Id. ¶¶ 28, 30.) The plaintiff organizations asserted claims for money damages on behalf of their members for personal injury and property damage based on theories of negligence and strict liability (see id. ¶¶ 180-85, 194-200), as well as public nuisance, private nuisance, and trespass (see id. ¶¶ 186-93, 206-09). The amended complaint also sought relief in the form of remediation of the former UCIL plant site, of community wells, and of plaintiffs' own properties (see id. ¶ 213), and "recov[ery of] the costs of a medical monitoring program" for residents exposed to the chemicals (id. ¶ 205).
 
 
 17
 Defendants Union Carbide and Warren Anderson, its former chief executive officer (collectively "Carbide"), moved to dismiss the pollution claims pursuant to Fed. R.Civ.P. 12(b)(1), 12(b)(6) and/or 56. They contended, inter alia, that Bi's damages claims for personal injury and property damage arising out of her alleged exposure to contaminated water were barred by the three-year statute of limitations governing "latent" injuries, N.Y.C.P.L.R. § 214-c(2). As to the plaintiff organizations, Carbide moved to dismiss for lack of standing, arguing that they could not meet the prerequisite that "neither the claim asserted nor the relief requested require[] the participation of individual members in the lawsuit," Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
 
 
 18
 With respect to plaintiffs' claims for equitable relief, defendants argued that an order requiring Union Carbide to remediate the former UCIL site would be infeasible and inappropriate given that possession of the site had been returned to its owner, the State of Madhya Pradesh. Carbide contended that any order that the site be remediated would thus entail insurmountable problems of judicial supervision and would interfere with India's national interest in its environmental regulation. Carbide also argued that a program of medical monitoring for the estimated tens of thousands of individuals who resided in Bhopal at any time in the more than 30 years since the UCIL plant commenced operations would be extraordinarily difficult, if not impossible, for a court in the United States to administer, especially since the amended complaint failed to identify any particular diseases or injuries believed to be caused by the chemicals.
 
 
 19
 In opposition to the motion to dismiss, Bi contended that she alleged "patent" rather than "latent" harms and that her claims should thus be analyzed under CPLR § 214 rather than CPLR § 214-c. She argued that under CPLR § 214 her action was not barred because the groundwater contamination constituted a continuing nuisance and continuing trespass, causing repeated harms that gave rise to successive causes of action and entitled her to seek damages for harms to her person and property incurred within the three years immediately prior to the filing of the amended complaint, despite the fact that the tortious conduct had begun at an earlier time. Bi also contended that, irrespective of whether her claims would otherwise be barred by CPLR § 214 and CPLR § 214-c, principles of equitable tolling and equitable estoppel should preserve her claims because Union Carbide had affirmatively misrepresented to the public that chemicals from the UCIL plant caused no contamination of the surrounding area.
 
 
 20
 The Bhopal organizations opposed Carbide's motion to dismiss their claims for lack of standing, arguing that Hunt and its progeny were distinguishable because they involved associations seeking to bring damages claims on behalf of their members in a non-class-action context, whereas the Bhopal organizations sought to pursue their members' monetary claims as putative class representatives. They argued that in these circumstances, the requirements of Fed.R.Civ.P. 23, rather than the Hunt test, should govern whether an association is a suitable plaintiff.
 
 
 21
 Finally, plaintiffs challenged Carbide's contention that the equitable relief requested in the amended complaint would present the district court with insurmountable difficulties. They argued that there would be no interference with local governance because (a) the Madhya Pradesh authorities had already sought a continuation of on-site rehabilitation efforts from UCIL's successor, (b) the State of Madhya Pradesh wants Union Carbide to rehabilitate the site, and (c) an injunction could incorporate the environmental standards of India. As to the requested medical monitoring program, the Bhopal organizations argued that the program would encompass only persons currently residing in Bhopal and currently exposed to chemicals from the former UCIL plant, a population that could be defined as individuals currently living in 10 neighborhoods affected by groundwater contamination, and that the program could screen for cancers and immune deficiencies caused by exposure to the groundwater contaminants identified in the Greenpeace Report.
 
 
 22
 C. The Dismissal of the Pollution Claims: Bano II
 
 
 23
 Following limited discovery by Bi and the Bhopal organizations, the district court granted defendants' motion to dismiss in its entirety. See Bano v. Union Carbide Corp., No. 99 Civ. 11329(JFK), 2003 WL 1344884 (S.D.N.Y. Mar.18, 2003) ("Bano II"). At the outset of its discussion, the court noted that, whereas the original complaint had alleged that plaintiffs' claims arose under the laws of India, their amended complaint abandoned reliance on Indian law and asserted instead that plaintiffs had no remedy under those laws (see Amended Complaint ¶ 139). The court concluded that plaintiffs' environmental claims should be addressed under New York law. See Bano II, 2003 WL 1344884, at *3 ("New York law applies in cases in which the harm occurs abroad, and where there is no conflict with the law of the foreign jurisdiction."). Further, as federal jurisdiction of the action was premised on diversity of citizenship, the district court ruled that the timeliness of plaintiffs' claims was governed by the New York statutes of limitations. See id. at *4.
 
 
 24
 As to the statute-of-limitations prong of defendants' motion, the district court ruled that Bi's personal injuries were properly classified as "latent" rather than "patent" in light of the assertions in her affidavit, because, although "the period between exposure and manifestation was not of great duration, the injuries did not manifest themselves immediately," id. at *4-5. Accordingly, the district court concluded that CPLR § 214-c(2) applied and that the limitations period began when an injury first manifested itself. See id. at *5. Bi's injuries having first manifested themselves in 1990, the court found that the three-year limitations period provided by CPLR § 214-c expired before Bi filed her personal injury claims in 2000. See id.
 
 
 25
 The court also found that Bi's personal injury claims were not made timely by CPLR § 214-c(4), which contains an exception to § 214-c's three-year limitations period where "technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would have been authorized," N.Y.C.P.L.R. § 214-c(4). In such circumstances, "where the discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury ... an action may be commenced or a claim filed within one year of such discovery of the cause of the injury." Id. Assuming arguendo the applicability of CPLR § 214-c(4), the district court concluded that Bi's personal injury claims would be time-barred because that section, allowing suit to be brought at most six years after the discovery of her injury, would have required that her claims, first asserted in 2000, be asserted not later than 1996. See Bano II, 2003 WL 1344884, at *5.
 
 
 26
 The court rejected Bi's claims of property damage for most of the same reasons, stating that
 
 
 27
 Bi's personal injury and property claims both stem from groundwater contamination. It is nonsensical to assert that Bi's personal injuries which manifested themselves in 1990 and to which she attributes the cause to be the well water should be viewed separately from her property damage claims.
 
 
 28
 Id. at *6.
 
 
 29
 Finally, the district court found that even if the harms alleged by Bi were deemed "patent," so that CPLR § 214 rather than CPLR § 214-c would control, her claims would still be time-barred. The court rejected Bi's contention that her claims for personal injuries were timely under continuing nuisance or continuing trespass doctrines, concluding that such doctrines could preserve claims only of property damage, not of personal injury. See id. at *6. And the court concluded that the continuing tort doctrines did not make Bi's property damage claims timely because those doctrines apply only to property damage claims seeking injunctive relief, not monetary relief. See id.
 
 
 30
 The district court rejected Bi's claim of fraudulent concealment, concluding that Union Carbide's alleged "concealment does not rise to the requisite level of misrepresentation." Id. at *7. It also ruled that tolling the statute of limitations based on equitable estoppel would be inappropriate because Bi possessed, within the limitations period, sufficient factual information to give her a duty to investigate the cause of her injuries. See id.
 
 
 31
 As to the Bhopal organizations, the district court found that they lacked standing to press claims for money damages because a determination of the residents' damages would require individualized proof and the individual participation of each of the organizations' members. See id. at *8. The court implicitly rejected the organizations' contention that the standing requirements articulated in Hunt should be relaxed where an organization seeks to maintain the suit as a class action.
 
 
 32
 Finally, the district court ruled that plaintiffs' request for an injunction requiring remediation of the former UCIL plant site would be infeasible, both because the court did "not wish to direct a foreign government as to how that state should address its own environmental issues," and because the court was concerned that it "would have no control over any remediation process ordered." Bano II, 2003 WL 1344884, at *8. The court ruled that the medical monitoring program proposed by the Bhopal organizations would be infeasible because of the impossibility of "[l]ocating thousands of people who have resided 8,000 miles away in Bhopal, India, over a span of more than thirty years." Id. at *9. The court stated that "the effort required to identify those citizens to be monitored would be limitless." Id. In addition, noting that Union Carbide had already funded a hospital in Bhopal with proceeds from the sale of its UCIL stock, the district court stated that "[t]his contribution goes far to satisfy any further obligation defendants have to the citizens of Bhopal." Id. The court concluded that balancing the request for medical monitoring expenses, "an extraordinary remedy requiring extensive factual research and impos[ing] a potentially indefinite duty upon defendants to care for a population for which [Union Carbide] has already made substantial efforts," against the fact that Union Carbide had funded the hospital in Bhopal "shows this request not to be equitable." Id.
 
 
 33
 Judgment was entered dismissing the amended complaint. Bi and the four Bhopal organizations described above (BGPMUS, BGPMSKS, BGPSSS, and BGIA) have appealed. The other plaintiffs have not appealed.
 
 II. DISCUSSION
 
 34
 On appeal, appellants principally pursue arguments they made in the district court in support of the timeliness of Bi's claims, the standing of the organizations to pursue damages claims on behalf of their members, and the appropriateness of injunctive relief. For the reasons that follow, we find merit only in the contention that Bi's claims for property damage may be timely.
 
 
 35
 A. The Applicability of CPLR § 214-c to Bi's Claims
 
 
 36
 As to timeliness, plaintiffs argue principally that CPLR § 214-c, which governs claims for injuries whose effects are latent, is inapplicable because (a) an interval of merely a few weeks between one's exposure to a harmful substance and the manifestation of one's injury is not sufficient to classify the effects as latent, (b) there was no evidence that there was any interval between Bi's exposure to such substances and the manifestation of her injuries, (c) defendants failed to show when Bi first learned of the damage to her property, and (d) the accrual date provided in § 214-c does not apply to claims for injunctive relief. We conclude that Bi's claims for damages and injunctive relief for property damage may be timely.
 
 
 37
 Section 214 of the CPLR, which generally governs claims for personal injury or injury to property, states, to the extent pertinent here, that, except as provided in § 214-c, an action to recover damages for injury to property must be brought within three years of the date of injury, see N.Y.C.P.L.R. § 214(4), and that, except as provided in § 214-c or in other sections not pertinent here, an action to recover for personal injury must be brought within three years of the date of injury, see N.Y.C.P.L.R. § 214(5). Section 214-c modifies § 214 with respect to a claimed injury that was not discoverable immediately upon its occurrence. It provides that for a "personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances," the three-year period within which a suit "to recover damages" must be brought "shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." N.Y.C.P.L.R. § 214-c(2) (emphasis added).
 
 
 38
 For purposes of CPLR § 214-c, a claim for a latent personal injury accrues "when the injured party discovers the primary condition on which the claim is based." Matter of New York County DES Litigation, 89 N.Y.2d 506, 509, 655 N.Y.S.2d 862, 863, 678 N.E.2d 474 (1997). The fact that there may be a delay before "the connection between th[e] symptoms and the injured's exposure to a toxic substance is recognized" does not delay the start of the limitations period. Id. Nor does the worsening of a plaintiff's symptoms over time alter or postpone the accrual date. See, e.g., Whitney v. Quaker Chemical Corp., 90 N.Y.2d 845, 847, 660 N.Y.S.2d 862, 863, 683 N.E.2d 768 (1997) (mem.). "All that is necessary to start the limitations period [of 214-c(2)] is that plaintiff be aware of the primary condition for which damages are sought." Id.; see, e.g., Tarazi v. Exxon Corp., 269 A.D.2d 385, 386, 703 N.Y.S.2d 205, 206 (2d Dep't) (mem.), lv. denied, 95 N.Y.2d 755, 711 N.Y.S.2d 833, 733 N.E.2d 1102 (2000).
 
 
 39
 Similarly, a damages claim for latent injury to property resulting from the seepage or infiltration of a toxic foreign substance over time is governed by the § 214-c limitations period. See, e.g., Jensen v. General Electric Co., 82 N.Y.2d 77, 81, 603 N.Y.S.2d 420, 421, 623 N.E.2d 547 (1993); see generally Germantown Central School District v. Clark, Clark, Millis & Gilson, AIA, 100 N.Y.2d 202, 206-07, 761 N.Y.S.2d 141, 143-44, 791 N.E.2d 398 (2003). Such a claim accrues when the plaintiff first discovers the property damage; the fact that the defendant's conduct may be characterized as a continuing trespass or nuisance does not delay the commencement of the limitations period. See, e.g., Jensen v. General Electric Co., 82 N.Y.2d at 88, 603 N.Y.S.2d at 425, 623 N.E.2d 547 (there is "no continuing-wrong exception" to § 214-c). Although subsection (4) of § 214-c provides a limited exception to the § 214-c(2) rule that the limitations period begins on the date of first discovery of the injury, see N.Y.C.P.L.R. § 214-c(4) (claim may be asserted within one year after discovery of the injury's cause, provided that, inter alia, the discovery-of-cause date is within five years after the discovery-of-injury date), that provision is of no assistance to a plaintiff whose claims were first asserted more than six years after she was aware of her alleged injuries.
 
 
 40
 Section 214-c(2), however, applies only to a claim for "damages." N.Y.C.P.L.R. § 214-c(2). Thus, the timeliness of a claim for injunctive relief is not governed by that section, see, e.g., Jensen v. General Electric Co., 82 N.Y.2d at 89-90, 603 N.Y.S.2d at 426, 623 N.E.2d 547, and an injunctive remedy may be available to halt a continuing nuisance or trespass even when the recovery of money damages is barred by the statute of limitations, see id. at 90, 603 N.Y.S.2d at 426, 623 N.E.2d 547. Although "causes of action for damages at law are placed in repose under CPLR § 214-c(2) after three years from discovery," the availability of "appropriate injunction relief is preserved in the traditional equity form." Id.
 
 
 41
 The statute of limitations is normally an affirmative defense, see N.Y.C.P.L.R. § 3018(b), on which the defendant has the burden of proof, see generally id. Practice Commentaries, C3018:13, at 149 (McKinney 1974); but see Pompa v. Burroughs Wellcome Co., 259 A.D.2d 18, 22, 696 N.Y.S.2d 587, 590 (3d Dep't 1999) (a plaintiff who relies on a statutory exception to the statute of limitations, such as CPLR § 214-c(4), has the burden of showing that the exception applies). The defendant's normal burden includes showing when the cause of action accrued. "Where it does not conclusively appear that a plaintiff had knowledge of facts from which the injury could reasonably be inferred, the complaint should not be dismissed on motion and the question should be left to the trier of fact." Glod v. Morrill Press Division of Engraph, Inc., 168 A.D.2d 954, 956, 564 N.Y.S.2d 905, 908 (4th Dep't 1990); see also Roman v. Radio Frequency Co., 207 A.D.2d 1012, 1012, 616 N.Y.S.2d 824, 824 (4th Dep't 1994) (mem.).
 
 
 42
 With these principles in mind, we turn to the various claims asserted by Bi in the present action.
 
 1. Bi's Claims of Personal Injury
 
 43
 Plaintiffs contend that the district court erred in ruling that an injury that manifests itself just weeks after one's exposure to a toxic substance can be considered "latent," arguing principally that CPLR § 214-c applies only to injuries that do not manifest themselves for many years. It may be that the New York State Legislature's primary concern in enacting CPLR § 214-c was for persons whose injuries manifested themselves after the three-year limitations period provided by CPLR § 214(5) had expired, see generally Jensen v. General Electric Co., 82 N.Y.2d at 83-84, 603 N.Y.S.2d at 422-23, 623 N.E.2d 547. But as enacted, CPLR § 214-c speaks simply in terms of whether the effects of an exposure are "latent," without specifying the length of time that must pass before those effects can be considered latent; and at least one New York appellate court has held that effects were latent within the meaning of § 214-c when the interval between exposure and first manifestation of injury was just a few weeks, see Crossman v. Harding Industrial Tool, 222 A.D.2d 1081, 635 N.Y.S.2d 397 (4th Dep't 1995) (mem.).
 
 
 44
 In Crossman, the plaintiff, a lathe operator, noticed a rash on his hands in January 1987, "within a few weeks after" his employer started using a certain substance as a machine coolant. Id. at 1081, 635 N.Y.S.2d 397, 635 N.Y.S.2d at 398. On the advice of the company doctor, the plaintiff temporarily ceased working on machines using the coolant; but after he resumed that work, additional skin eruptions and irritations appeared on his hands in March 1987. When the dermatitis continued to worsen, the company doctor on April 14, 1987, referred the plaintiff to a dermatologist. On April 30, 1987, the dermatologist informed the plaintiff that he suffered from chronic dermatitis as the result of direct hand contact with the coolant. See id., 635 N.Y.S.2d at 398-99. The plaintiff's action for damages for personal injuries caused by exposure to the coolant was commenced on April 17, 1990. The trial-level court dismissed the case on the ground that the action was preempted by a federal statute. See id., 635 N.Y.S.2d at 398. The Appellate Division affirmed the dismissal, but it ruled that the complaint should have been dismissed instead on the ground that the action was barred by CPLR § 214-c's three-year statute of limitations for "latent" injuries, since "[t]he record conclusively establishe[d] that plaintiff discovered before April 17, 1987 that he had sustained an injury." 222 A.D.2d at 1082, 635 N.Y.S.2d at 399.
 
 
 45
 The Crossman plaintiff's injury was thus found to be "latent" within the meaning of CPLR § 214-c when it manifested itself "within a few weeks after" his exposure to the coolant, 222 A.D.2d at 1081, 635 N.Y.S.2d at 398. Accordingly, in the present case, we see no error in the district court's ruling that the effects of Bi's alleged exposure to harmful substances emanating from the plant site are to be considered latent, notwithstanding that the interval between her exposure and the injuries' initial manifestation was not years but, in Bi's words, "a few weeks."
 
 
 46
 Plaintiffs argue alternatively that the record does not indicate that there was any interval whatever between Bi's exposure to contamination from the former UCIL plant and the manifestation of her injuries. This contention is contradicted by the amended complaint and Bi's own affidavit. Plaintiffs alleged that waters in areas adjacent to the plant were contaminated by the mishandling of hazardous materials "[d]uring the entire period that the Bhopal plant was in operation" (Amended Complaint ¶ 98), a period that predated Bi's move to "the immediate vicinity of the UCIL plant site" (Bi Aff. ¶ 4). Bi stated in her affidavit that her injuries began to manifest themselves "a few weeks" after that move; that "at least some of" her "symptoms appeared to be generally associated with drinking, cleaning, cooking or bathing with water taken from the handpump water well near where" she lived; that there was "simply no alternative source of potable water in the particular residential area of Bhopal where [her] family live[d]"; and that "[a]ll of the handpump wells in the nearby residential areas also seem to be contaminated...." (Id. ¶¶ 5-8.) These statements by Bi as to the absence of any sources of water other than those that the amended complaint alleged were already contaminated can only mean that Bi was exposed to the contaminants upon her move. And given her statement that her injuries first manifested themselves within "a few weeks" after that move, plaintiffs' own assertions show an interval between Bi's exposure and the initial manifestation of her injuries.
 
 
 47
 We conclude that the district court properly ruled that CPLR § 214-c was applicable to Bi's personal injury claims and that, as her injuries manifested themselves in 1990 and she did not bring suit until 2000, those claims were therefore barred by § 214-c's three-year statute of limitations.
 
 2. Bi's Claims of Property Damage
 
 48
 We reach a different conclusion as to the dismissal of Bi's claims of property damage, for, although CPLR § 214-c governs those claims as well, a plaintiff's discovery of one injury does not necessarily mean that she discovered a separate and distinct injury simultaneously. See, e.g., State v. Fermenta ASC Corp., 238 A.D.2d 400, 402, 656 N.Y.S.2d 342, 345 (2d Dep't) (mem.), lv. denied, 90 N.Y.2d 810, 664 N.Y.S.2d 271, 686 N.E.2d 1366 (1997); Bimbo v. Chromalloy American Corp., 226 A.D.2d 812, 815, 640 N.Y.S.2d 623, 625-26 (3d Dep't 1996). The question of whether two claimed injuries are separate and distinct or whether, instead, one was an "outgrowth, maturation or complication" of a previously discovered — and now time-barred — injury is a question of fact. State v. Fermenta ASC Corp., 238 A.D.2d at 402, 656 N.Y.S.2d at 345 (internal quotation marks omitted); see, e.g., Bimbo v. Chromalloy American Corp., 226 A.D.2d at 815, 640 N.Y.S.2d at 625. The question of when a plaintiff actually discovered a given injury is also a question of fact. See, e.g., Glod v. Morrill Press Division of Engraph, Inc., 168 A.D.2d at 956, 564 N.Y.S.2d at 908. The question of the time by which the plaintiff had constructive knowledge of the injury, i.e., the time by which she "could with reasonable diligence have discovered" the injury, CPLR § 214-c(2), is ordinarily "a mixed question of law and fact," Glod v. Morrill Press Division of Engraph, Inc., 168 A.D.2d at 955, 564 N.Y.S.2d at 908. The existence of material factual disputes concerning such questions precludes summary dismissal of the action.
 
 
 49
 In Bimbo v. Chromalloy American Corp., for example, the plaintiffs, who knew in 1978 that their well water was contaminated, brought suit for contamination of the shallow groundwater on their property after they were warned of the latter contamination in 1992. The defendants moved to dismiss on statute-of-limitations grounds. The trial court denied the motion because of conflicting evidence as to the relationship between the contamination of the shallow groundwater and the contamination of the well water. See 226 A.D.2d at 812-15, 640 N.Y.S.2d at 624-25. The Appellate Division affirmed, stating that because the defendants had not definitively shown that the plaintiffs' claimed damage to shallow groundwater "was an outgrowth, maturation or complication" of a known but different injury, id. at 815, 640 N.Y.S.2d at 625 (internal quotation marks omitted), summary dismissal of the groundwater damage claim would have been "premature," id.
 
 
 50
 In the present case, the district court dismissed Bi's claims of property damage on the ground that the manifestation of her personal injuries in 1990, which she attributed to contaminated well water, gave her constructive knowledge, as a matter of law, of the damage to her property. We disagree. Although the amended complaint alleged that defendants had discharged chemicals, pesticides, and other pollutants onto property owned by Bi and the organizations' members (see, e.g., Amended Complaint ¶¶ 207, 191), with the result that "[p]laintiff's [sic] properties and environment are highly contaminated with toxic substances" (id. ¶ 211), the record is silent as to when Bi first learned of the contamination of her property. Her realization in 1990 that she was suffering bodily injury from contaminated well water is not dispositive because the affidavit indicates that the well from which she obtained water was not on her property. (See Bi Aff. ¶ 6 (describing Bi's use of "the handpump water well near where I live") (emphasis added).)
 
 
 51
 Defendants have not called to our attention any evidence that shows definitively the date on which Bi knew or with reasonable diligence should have known that her property was contaminated. They contend that the 1999 Greenpeace report, on which Bi relied as the basis for her allegation that her property is contaminated, provided no information that was not available to Bi in 1990, and that Bi thus knew or should have known of this injury in 1990. We disagree. As discussed in Part I.A. above, findings of no contamination emanating from the plant site were reported by the Indian governmental organization NEERI in 1990 and 1997. (See First NEERI Report at unnumbered Foreword page ("[i]nvestigations revealed that the land and water environment have not been contaminated...."); Second NEERI Report at unnumbered page 5 of Executive Summary (reaffirming First NEERI Report's finding of no groundwater contamination in and around the plant site).) In contrast, the Greenpeace Report issued in November 1999 stated that contamination was found on land "both within and surrounding" the former UCIL plant site. (Greenpeace Report at 4 (emphasis added).) Given the contrary prior reports by NEERI, a factfinder could permissibly infer that Bi in fact gained from the Greenpeace Report material information that she lacked earlier. Thus, there are questions of fact to be resolved as to when Bi learned, or with reasonable diligence should have learned, of the alleged damage to her property.
 
 
 52
 Finally, as discussed above, CPLR § 214-c provides a limitations period only with respect to claims for damages. Thus, to the extent that the relief requested by Bi on her property damage claims included injunctive relief in the form of remediation of her property or remediation of the former UCIL plant site, those claims are not barred by § 214-c, although, as discussed in Part II.C. below, the latter form of relief may be impracticable.
 
 
 53
 In considering Bi's property damage claims on remand, the district court may also consider whether Bi is qualified to serve as a class representative to litigate such claims for damages or injunctive relief on behalf of similarly situated individuals. We express no view as to the merits of that question.
 
 
 54
 B. The Organizations' Standing To Pursue Their Members' Claims
 
 
 55
 The Bhopal organizations, which have not pleaded any injury to themselves, contend that the district court should have allowed them to pursue the damages claims belonging to their respective members. We see no error in the court's conclusion that the organizations lack standing to pursue those claims.
 
 
 56
 In determining whether an association has standing to maintain a suit to redress its members' injuries, rather than an injury to itself, we apply a three-pronged test. See, e.g., Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Under this test, the association has standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt, 432 U.S. at 343, 97 S.Ct. 2434; see also United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) ("Brown Group"); International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock, 477 U.S. 274, 282, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) ("Brock"); Warth v. Seldin, 422 U.S. at 511, 95 S.Ct. 2197.
 
 
 57
 "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." Id. at 515, 95 S.Ct. 2197. We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members. In Warth, the Supreme Court held that an organization seeking to recover damages on behalf of its members lacked standing because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." Id. at 515-16, 95 S.Ct. 2197; see also id. at 515, 95 S.Ct. 2197 ("[I]n the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree."). The Warth Court stated that
 
 
 58
 [i]f in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.
 
 
 59
 Id. at 515, 95 S.Ct. 2197. This does not mean, however, that an association automatically satisfies the third prong of the Hunt test simply by requesting equitable relief rather than damages. The organization lacks standing to assert claims of injunctive relief on behalf of its members where "the fact and extent" of the injury that gives rise to the claims for injunctive relief "would require individualized proof," Warth v. Seldin, 422 U.S. at 515-16, 95 S.Ct. 2197, or where "the relief requested [would] require[] the participation of individual members in the lawsuit," Hunt, 432 U.S. at 343, 97 S.Ct. 2434.
 
 
 60
 In contrast, where the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the Hunt test may be satisfied. In Brock, the Supreme Court ruled that a union had standing to challenge a "policy directive" of the United States Department of Labor that "allegedly resulted in the denial of [trade readjustment allowance] benefits to thousands of the Union's members." 477 U.S. at 281, 106 S.Ct. 2523. In so ruling, however, the Court noted that the suit did not directly seek recovery of the individual union members' denied benefits, see id. at 284, 106 S.Ct. 2523, and that "the unique facts of each [union] member's claim" for "the benefits allegedly due him" would be adjudicated by state authorities, id. at 288, 106 S.Ct. 2523. The Brock Court concluded that the union had standing because it "raise[d] a pure question of law: whether the Secretary properly interpreted the Trade Act's ... eligibility provisions," id. at 287, 106 S.Ct. 2523; the union thus "c[ould] litigate th[e] case without the participation of those individual claimants," id. at 288, 106 S.Ct. 2523. See also Hunt, 432 U.S. at 344, 97 S.Ct. 2434 (organization had standing where "neither the interstate commerce claim nor the request for declaratory and injunctive relief require[d] individualized proof and both [we]re thus properly resolved in a group context").
 
 
 61
 Although the Bhopal organizations argue that they have the ability to pursue their members' damages claims without the participation of the members themselves, we disagree. The claims are that individuals have suffered bodily harm and damage to real property they own. Necessarily, each of those individuals would have to be involved in the proof of his or her claims. The district court did not err in concluding that the organizations lack standing to pursue these claims.
 
 
 62
 The Bhopal organizations also urge this Court to disregard the third Hunt requirement for associational standing because they seek to pursue their members' claims as class representatives in a class action pursuant to Rule 23. Although Hunt's third prong represents a prudential rather than a constitutional requirement for standing, see Brown Group, 517 U.S. at 557, 116 S.Ct. 1529, we see no reason to relax it where, in order for the organizations to succeed in the lawsuit, there must be participation by the members themselves. Associational standing carves only a narrow exception from the ordinary rule that a litigant "`must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,'" Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting Warth v. Seldin, 422 U.S. at 499, 95 S.Ct. 2197). If the involvement of individual members of an association is necessary, either because the substantive nature of the claim or the form of the relief sought requires their participation, we see no sound reason to allow the organization standing to press their claims, even where it seeks to do so as a putative class representative. In such circumstances, the standing of an association is limited to bringing claims arising out of injuries that the organization, not simply its members, suffered.
 
 
 63
 For similar reasons, we conclude that the organizations' claims seeking relief for their members in the form of reimbursement for the costs of medical monitoring of their physical condition were dismissible for lack of associational standing. In Rent Stabilization Ass'n v. Dinkins, 5 F.3d 591, 596 (2d Cir.1993), for example, we upheld a ruling that an association of landlords lacked standing to bring an "as-applied" Takings Clause challenge to a rent-control law on behalf of its members because the Court "would have to engage in an ad hoc factual inquiry for each landlord who alleges that he has suffered a taking," including "determin[ing] the landlord's particular return based on a host of individualized financial data, and... investigat[ing] the reasons for any failure to obtain an adequate return." Id. (emphasis in original). Proof of claims for medical monitoring under New York law would similarly require individualized inquiries. In Abusio v. Consolidated Edison Co. of New York, Inc., 238 A.D.2d 454, 656 N.Y.S.2d 371 (2d Dep't 1997) (mem.), the court held that in order to prevail on such a claim, "a plaintiff must establish both that he or she was in fact exposed to the disease-causing agent and that there is a `rational basis' for his or her fear of contracting the disease," id. at 454, 656 N.Y.S.2d 371, 656 N.Y.S.2d at 372, which the court construed to mean the "clinically demonstrable presence" of a carcinogen in the plaintiff's body or some indication of a disease induced by the carcinogen, id. at 455, 656 N.Y.S.2d at 372. We cannot envision a medical monitoring program that would not require the participation of the organizations' individual members.
 
 
 64
 We take a similar view of the Bhopal organizations' request for remediation of their members' private properties. Participation by individual property owners would be needed to permit identification of which properties were contaminated. As to each property so identified, individual assessments would be required as to the nature, breadth, and severity of the contamination, and consideration would have to be given to, inter alia, each owner's actual and intended use or uses of his or her land, in order to permit a determination as to which specific remediation methods would be appropriate for the clean-up of that property. We conclude that, because the individual participation of the organizations' members would be necessary before an injunction ordering remediation of their private properties could be issued, the Bhopal organizations lack standing to pursue this form of relief on behalf of their members.
 
 
 65
 In sum, we affirm the district court's dismissal of the claims asserted by the organizations, given our conclusions that determinations as to the injuries suffered by individual members and the needs of each such individual for medical monitoring and/or for remediation of his or her own property cannot be made without the participation of the members. We therefore need not consider the district court's conclusion that medical monitoring would be impracticable.
 
 
 66
 C. Dismissal of the Claim for Remediation of the Plant Site
 
 
 67
 Finally, we reject plaintiffs' contention that the district court erred in dismissing their claims for remediation of the former UCIL plant site. "In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow." Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973). A district court's grant or denial of equitable relief is reviewed for abuse of discretion, which may consist of, inter alia, a ruling based on an erroneous view of the law or on a clearly erroneous assessment of the evidence. See generally Zervos v. Verizon New York, Inc., 252 F.3d 163, 169-71 & n. 5 (2d Cir.2001).
 
 
 68
 "The practicability of drafting and enforcing an order or judgment for an injunction is one of the factors to be considered in determining the appropriateness of injunction against tort." Restatement (Second) of Torts § 943 (1979) ("Restatement"). The federal court sitting as a
 
 
 69
 court of equity having personal jurisdiction over a party has power to enjoin him from committing acts elsewhere. But this power should be exercised with great reluctance when it will be difficult to secure compliance with any resulting decree or when the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country.
 
 
 70
 Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 647 (2d Cir.1956) (footnote omitted). "If drafting and enforcing are found to be impracticable, the injunction should not be granted." Restatement comment a; see also Bethlehem Engineering Export Co. v. Christie, 105 F.2d 933, 935 (2d Cir.1939) (denying injunctive relief as impracticable). There may be circumstances in which it is appropriate for a court to grant injunctive relief with respect to the remediation of an environmental problem in a foreign country, as, for example, where the other nation has attempted to join the federal lawsuit, see, e.g., Jota v. Texaco Inc., 157 F.3d 153, 155, 158 (2d Cir.1998), and "much of the relief sought could be fully provided by [the defendant] without any participation by [the other nation]," id. at 162. But injunctive relief may properly be refused when it would interfere with the other nation's sovereignty. See generally Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d at 647; 11A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2942, at 52-53 (2d ed.1995).
 
 
 71
 In the present case, the plant-site remediation sought by plaintiffs would necessarily require the cooperation of the State of Madhya Pradesh, for it is the current owner and possessor of the land. And although the district court inferred that Madhya Pradesh would cooperate in a remediation effort, see Bano II, 2003 WL 1344884 at *8, Madhya Pradesh has neither been made a party to this lawsuit nor sought to intervene, and the record contains no communication from Madhya Pradesh or the Indian government indicating its receptivity to an order of a United States court compelling work on the property. Thus, Union Carbide's ability to comply with an injunction requiring remediation of the former UCIL plant site would be dependent on permission from an entity that is not a party to this lawsuit and that, therefore, cannot be subject to the district court's injunction. See, e.g., Alemite Manufacturing Corp. v. Staff, 42 F.2d 832, 832 (2d Cir.1930) ("[N]o court can make a decree which will bind any one but a party."). Given that circumstance, along with the concerns expressed by the district court as to the difficulty that a United States court would have in controlling and overseeing the progress of remediation in India, we see no abuse of discretion in the court's conclusion that an injunction for remediation of the plant site would be impracticable. However, given that the matter is to be remanded for further proceedings with respect to Bi's claims of damage to her property, we believe the district court should be free to revisit its dismissal of the claim for plantsite remediation in the event that the Indian government or the State of Madhya Pradesh seeks to intervene in the action or otherwise urges the court to order such relief.
 
 CONCLUSION
 
 72
 We have considered all of plaintiffs' contentions on this appeal and, except to the extent indicated above, have found them to be without merit. The judgment of the district court is affirmed except to the extent that it dismissed Bi's claims for property damage, and the matter is remanded for further proceedings with respect to those claims, including consideration of whether Bi may prosecute those claims in a class action. The court is also free, consistent with this opinion, to reconsider, prior to the entry of a final judgment, plaintiffs' request for relief in the form of remediation of the former UCIL plant site.